# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01415-SCT

*BAYVIEW LAND, LTD., A NEVADA CORPORATION, AND IMPERIAL PALACE OF MISSISSIPPI, INC., A NEVADA CORPORATION; TREASURE BAY LLC, JUNE S. MLADINICH AND MLADINICH FAMILY LIMITED PARTNERSHIP*

*v.*

*STATE OF MISSISSIPPI BY AND THROUGH ERIC CLARK IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE AS TRUSTEE OF PUBLIC TIDELANDS TRUST; TAL FLURRY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS TAX ASSESSOR OF HARRISON COUNTY, MISSISSIPPI; DAVID V. LAROSA, SR., IN HIS OFFICIAL CAPACITY AS TAX COLLECTOR OF HARRISON COUNTY, MISSISSIPPI; THE BOARD OF SUPERVISORS OF HARRISON COUNTY, MISSISSIPPI IN THEIR OFFICIAL CAPACITY; CITY OF BILOXI, MISSISSIPPI, AND THE BILOXI MUNICIPAL SEPARATE SCHOOL DISTRICT*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/22/2004 |
| TRIAL JUDGE: | HON. DONALD B. PATTERSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | BRITT R. SINGLETARY |
| | TINA ROSE SINGLETARY |
| | SAMUEL L. BEGLEY |
| | DEAN HOLLEMAN |
| | MICHAEL B. HOLLEMAN |
| | W. JOEL BLASS |

ATTORNEYS FOR APPELLEES:    JAMES LAWTON ROBERTSON
                            OFFICE OF THE ATTORNEY GENERAL
                            BY: NANCY MORSE PARKES
                            KAREN J. YOUNG
                            JOSEPH R. MEADOWS
                            GINA BARDWELL TOMPKINS
                            RONALD G. PERESICH

NATURE OF THE CASE:         CIVIL - REAL PROPERTY
DISPOSITION:                REVERSED AND REMANDED - 10/12/2006
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     This case is best described as a land ownership and boundary dispute between the State of Mississippi and Bayview Land, Ltd., and Imperial Palace of Mississippi, Inc., concerning land upon which the Imperial Palace casino had built a parking garage and a hotel, although tax questions between the State of Mississippi and all of the Appellants are also at issue. The casino had obtained various federal, state, county and city permits to build the hotel and garage before this dispute arose. The case centers around questions of ownership of the land on which the hotel and garage are located. The land, which borders Biloxi Back Bay near the Mississippi Gulf Coast, and which the State asserts is a part of the public trust tidelands, had been extended seaward over many years, undisputedly changing the shoreline. The portion of additional land consists of 3.05 acres of what are known as artificial accretions extending into the water it borders. Artificial accretions occur in various ways, such as from an accumulation of oyster shells, or "wharfing out." Bayview and Imperial Palace argue that such accreted land vests in

2

the State only if the State meets its statutory burden to prove (1) the accretions were not made as statutorily permitted consistent with the Mississippi Constitution and (2) for a higher public purpose – a burden the appellants argue the State did not meet. The State argues that the land had been extended seaward by these accretions (the shoreline has undisputedly changed over many years) and that the portion of the land created by artificial accretions, as well as the accompanying littoral rights, should be vested in the State. After a lengthy trial, the chancellor agreed with the State. For the reasons stated, we reverse the final judgment entered by the Chancery Court for the Second Judicial District of Harrison County, and remand this case to the chancellor with directions to enter an appropriate judgment after conducting further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. The land in question borders the Back Bay of Biloxi, a body of water connected to the Gulf of Mexico. The Mississippi Sound is directly below Mississippi's southern boundary of beaches and shoreline, and includes filled tidelands or fastlands, being the part of the land that is covered with water and uncovered daily as it lies between high and low tides. Black's Law Dictionary 1482 (6th ed. 1990). This is to be distinguished from what are known as submerged lands, which remain under water. The portion of the Imperial Palace of Mississippi (IPM) parcel in question bordering the water on the Biloxi Back Bay is approximately 3.05 acres of land created by artificial accretions which comprise the extension of land into the water. The term accretion is "usually applied to the gradual and imperceptible accumulation of land by natural causes, as out of the sea or a river." *Id.* at 20. The high tide mark can be changed

3

naturally through accretions or through reliction, when the land is uncovered through a gradual subsidence of water. However, accretions can also be artificial or man-made, for example, through the accumulation of oyster shells over time, or what is known as "wharfing out" into the water, which is establishing or affixing to the land a permanent structure to some point within a navigable body of water. *Id.* at 1595. IPM facilities on the disputed property include a 32-story hotel and a 12-story, 1300-car parking garage. The disputed land is bordered on the south by Bayview Avenue (which runs in a generally east and west direction), and on the west by Caillavet Street (which runs in a generally north and south direction). Interstate 110 (which connects Interstate I-10, running generally in an east-west direction, with U. S. Highway 90, also running generally in an east-west direction) is located just west of (and parallel with) Caillavet Street. The land is bound on the north and east by a steel bulkhead on the Back Bay. This appeal comes to the Court after the consolidation of three chancery court actions with separate cause numbers, all of which had been filed in the Chancery Court for the Second Judicial District of Harrison County. Bayview Land, Ltd. (Bayview), and Imperial Palace of Mississippi, Inc. (IPM),[1] filed suit in cause number C2402-98-00389 on April 3, 1998, naming as the defendant the State of Mississippi via Secretary of State Eric Clark in his official capacity. Bayview owns land in fee simple in Harrison County and, through a lease agreement, IPM operates a casino and hotel on that property. These two Nevada corporations brought suit

---

[1]Bayview and Imperial Palace will sometimes be referred to collectively as "IPM." Likewise, we will on occasion use the term "IPM" to refer collectively to all appellants in these consolidated causes.

4

to resolve the dispute of the location of the boundary on the Bayview land and for declaratory, injunctive, and equitable relief. The State filed its answer and counterclaim, stating that pursuant to the Public Trust Tidelands Act, Miss. Code Ann. §§ 29-15-1, et seq. (Rev. 2005), the accreted land in question belonged to the State of Mississippi and was held in trust, with the Secretary of State as the trustee. The owner of the 3.05-acre accreted land would of course also be the owner of the littoral rights of the land.[2]

¶3. IPM filed suit in another case under cause number C2402-01-00251 on March 21, 2001, naming as defendants Tal Flurry, Harrison County Tax Assessor, David V. Larosa, Sr., Harrison County Tax Collector; and the Harrison County Board of Supervisors. IPM claimed that it had paid, or caused to be paid through its lessor, Bayview, taxes levied on its land. The crux of the complaint was that IPM had been subject to double taxation and questionable tax valuation methods and that therefore IPM's constitutional rights were violated, grounding its cause of action in violations of due process, equal protection of the laws, and civil rights. The answer filed denied any of these claims and asserted a counter-complaint that the State owned the lands because of the Public Trust Tidelands Act. On June 4, 2001, Treasure Bay, LLC[3]

---

[2]Littoral rights are those rights concerning property which abuts an ocean, sea or lake. *Columbia Land Dev., LLC v. Sec'y of State*, 868 So.2d 1006, 1012 (Miss. 2004) (citing *Watts v. Lawrence*, 703 So.2d 236, 238 (Miss. 1997) (quoting Black's Law Dictionary 934)).

[3]While this matter has been pending before us on appeal, this Court entered an order granting the joint motion of Treasure Bay Corp. and the Mladinich Family Limited Partnership to have Treasure Bay LLC substituted and designated as the real party in interest, with the Mladinich Family Limited Partnership likewise remaining a party to this appeal. For the sake of clarity, we will refer to Treasure Bay LLC simply as "Treasure Bay." Treasure Bay Casino is located on Highway 90, overlooking the Mississippi Sound and the Gulf of Mexico.

filed suit in cause number C2401-01-00522, naming as defendants Flurry and Larosa, in their official capacities as Harrison County Tax Assessor and Tax Collector, respectively, and the Harrison County Board of Supervisors. Treasure Bay's complaint prayed for injunctive and other relief due to taxes assessed to Treasure Bay as the lessee of a parcel of land. Treasure Bay's complaint was almost identical to IPM's complaint filed in cause number C2402-01-00251, and stated that Treasure Bay had paid taxes, or caused the taxes to be paid, on its land through its lessor, June S. Mladinich.

¶4. On a joint motion of the parties in the two tax cases, the trial court entered an agreed order on August 1, 2001, consolidating the two cases. On August 14, 2001, the Secretary of State filed a motion for leave to intervene as a party in the IPM tax case under Miss. R. Civ. P. 24, and that motion was granted. The Secretary of State then filed its Answer and Complaint in Intervention on September 4, 2001. After holding a hearing, the trial court granted the motion on September 10, 2001, and ordered that all three cases be consolidated. That same day, the City of Biloxi also filed its answer to the complaint in intervention. The City of Biloxi and the Biloxi Public School District joined in the State's Expert Witness Disclosure on October 1, 2001, as parties in interest in support of the Secretary of State as plaintiff in intervention. On November 14, 2001, Mladinich filed her answer to the Secretary of State's Complaint in Intervention and cross-claim against Treasure Bay, her lessee, praying for indemnification from any taxes assessed against Treasure Bay.[4] On December 3, 2001, this

---

[4]Treasure Bay would later answer the cross-claim on May 3, 2002.

6

Court appointed Judge Donald Patterson to be the Special Judge to preside over the case. On December 31, 2001, Chancellor Patterson ordered that the trial be bifurcated.

¶5.     On April 22, 2002, the chancellor entered a very thorough ten-page opinion ("Decision of the Court"), in which the chancellor acknowledged that the ultimate issue at trial would be "the location on the ground of the boundary line between land belonging to IPM (Uplands) and lands held by the State as part of the Public Tidelands Trust (Tidelands)," and that this issue could not be litigated and determined "until the court resolve[d] the threshold controversy of the significance, if any, of the location of the boundary of the Public Trust, as shown on the Secretary's final certified map." In the end, the trial court concluded that at the trial, the Secretary of State would have the burden of proving by a preponderance of the evidence "(1) the exact location on the ground of the boundary line delineated on the final certified map and (2) that some exact portion of [IPM's] property violates the public trust." En route to this decision, the chancellor meticulously analyzed Miss. Code Ann. §§ 29-15-1, et seq. (more specifically, section 29-15-7), and this Court's decision in *Secretary of State v. Wiesenberg*, 633 So.2d 983 (Miss. 1994). On May 6, 2002, the Secretary of State, via a motion to reconsider, requested the trial court to revisit its decision in light of this Court's decision in *Stewart v. Hoover*, 815 So.2d 1157 (Miss. 2002) (decided, April 18, 2002), which was handed down after the parties had completed their briefing and "only two business days prior to entry" of the opinion. The chancellor eventually granted the Secretary's motion for rehearing and

withdrew its opinion of April 22, 2002.[5]   In **Stewart**, one party argued his property was not subject to the trust because the final certified map did not contain the property at issue; however, we held that "the Legislature's goal of establishing certain and stable land titles does not contemplate a loss of public trust lands because of an oversight in the mapping process." *Id.* at 1162.   In the case sub judice, in disposing of the motion to reconsider, the trial court allowed the Secretary of State to proceed with additional proof, notwithstanding the 1994 final certified map, and allowed Bayview and IPM to present rebuttal evidence.   The trial court further passed on the remaining issues contained in the motion, for a subsequent ruling after the trial of this case.

¶6.   The twenty-five day trial began August 20, 2002, and concluded on November 18, 2002 (with obvious extended recesses).[6]   The trial court heard testimony from twenty-one witnesses and received more than four hundred exhibits.   At the conclusion of this lengthy trial, the chancellor understandably took this matter under advisement, and on April 9, 2004, the chancellor entered his Findings of Fact and Conclusions of Law.   On June 22, 2004, the trial court entered its final judgment consistent with its findings of fact and conclusions of law, denying along the way, motions to reconsider.   The practical effect of this judgment was that

---

[5]In its findings of fact and conclusions of law entered on April 9, 2004, subsequent to the trial of this cause, the chancellor conceded what he perceived to be error in light of **Stewart** and withdrew his opinion of April 22, 2002.

[6]The trial covered a span of ninety days, which obviously means that the trial was not conducted over a period of twenty-five consecutive business days.

8

the State was vested with title to the disputed land. On July 9, 2004, the chancellor entered an amendment to the judgment to correct a clerical error. This appeal ensued.

## DISCUSSION

¶7. Mladinich, the Mladinich Limited Family Partnership, Bayview, IPM, and Treasure Bay, all timely appealed from the final judgment entered by the chancellor. Bayview and IPM appeal the trial court's findings that title to the accretions and littoral rights were confirmed as belonging to the State, and that the 3.05 acres of the artificial accretion land cut off all littoral rights to Bayview and IPM, whose property originally bordered the Back Bay of Biloxi. Bayview and IPM argue that the State failed in meeting its burden of proving that any accretions were not already vested in the uplands owner by common or statutory law of the public trust. The State argues that the findings of the chancery court are well-supported by substantial credible evidence and that the chancery court correctly found that the fastlands are held by the State as part of the Public Trust Tidelands. Flurry, Larosa, the Board of Supervisors of Harrison County, the City of Biloxi, and the Biloxi Municipal Separate School District all joined the Secretary of State's appellate brief which was submitted to this Court. The issues raised today include constitutional questions of takings of the littoral rights, tax questions, and interpretation of the 1989 Public Trust Tidelands Act. The State argues no questions of first impression exist, but the various appellants argue that the questions of first impression include what constitutes reasonable use of riparian/littoral rights, how those rights are cut off by accretions, and how the 1989 Public Trust Tidelands Act should be construed with regard to

9

a tidelands boundary dispute in developed areas under the Act. We will restate and reorder these various issues in today's discussion.

¶8. When we are called upon to review a chancellor's opinion after a plenary trial on the merits of a case, our standard of review is well established. This Court will not reverse the chancellor's findings of fact "unless they are manifestly wrong, not supported by substantial credible evidence, or an erroneous legal standard was applied." *Columbia Land Dev., LLC v. Sec'y of State*, 868 So.2d 1006, 1011 (Miss. 2004) (citing *Vaughn v. Vaughn*, 798 So.2d 431, 433 (Miss. 2001); *Tucker v. Prisock*, 791 So.2d 190, 192 (Miss. 2001)). On the other hand, when we review questions of law, a de novo standard of review is applied. *Tucker*, 791 So.2d at 192 (citing *In re Carney*, 758 So.2d 1017, 1019 (Miss. 2000)).

## I. WHETHER ARTIFICIAL ACCRETIONS RESULTING FROM CERTAIN SPECIFIC CAUSES ARE VESTED IN THE UPLANDS OWNER

¶9. Bayview and IPM assert that the State failed to meet its burden of proving by a preponderance of the evidence that any accretions were not already vested in the uplands owner by common or statutory law. The State, as appellee, asserts that: (1) the findings of the chancery court are well-supported by substantial credible evidence; and, (2) the chancery court correctly found that the fastlands are held by the State as part of the Public Trust Tidelands.

### A. The origin of Mississippi's tidelands in trust

¶10. Before beginning our analysis, we provide an overview of the history of this body of law. Before Mississippi entered statehood in 1817, title to the tidelands and navigable waters

within its boundaries had been held by the United States. *Wiesenberg*, 633 So.2d at 987. Upon Mississippi's entering the Union in 1817, title to those tidelands and navigable waters "was conveyed to Mississippi in trust and became immediately vested, subject to that trust." *Id.* (citations omitted). This principle has been recognized by the United States Supreme Court. "[W]e reaffirm our longstanding precedents which hold that the States, upon entry into the Union, received ownership of all lands under waters subject to the ebb and flow of the tide." *Phillips Petroleum Co. v. Miss.*, 484 U.S. 469, 476, 108 S. Ct. 791, 795, 98 L. Ed. 2d 877, 886 (1988). "[T]he individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Id.* at 475.

¶11.    Actually, two great public trusts were created and conveyed to each new state, sixteenth section school lands and "the tidelands and navigable waters of the state together with the beds and lands underneath same." *Cinque Bambini P'ship v. State*, 491 So. 2d 508, 511 (Miss. 1986). We are concerned today with the latter of these "two great public trusts,"which we have described as those lands, "including their mineral and other subsurface resources, subject to the ebb and flow of the tide below the [1817] mean high water level – regardless of whether the water courses were commercially navigable at the time of Mississippi's admission into the Union, regardless of how insignificant the tidal influence, or how shallow the water, regardless of how far inland and remote from the sea. Similarly granted were the beds and streams of all non-tidal waters which were navigable in fact in 1817." *Id.* at 516-17. It is also clear in our case law that since the time Mississippi entered the Union and received both these tidelands

11

and these submerged lands in trust,[7] "the common law of this State has adhered to the doctrine of public trust, applying it in both sixteenth section lands as well as tidelands." *Wiesenberg*, 633 So.2d at 987 (citations omitted). "The only way public trust lands can be disposed of is if it is done pursuant to 'a higher public purpose,' while at the same time not being detrimental to the general public. Once land is held by the state in trust, properties are committed to the public (purpose) trust and may be alienated from the State only upon the authority of legislative enactment and then only consistent with the public purposes of the trust." *Id.* (citations omitted). Additionally, we have interpreted Miss. Const. art.4, § 104 (1890)[8] to hold that the State's title to these public tidelands "may not be lost via adverse possession, limitations or laches." *Cinque Bambini*, 491 So.2d at 521.

¶12. Naturally, and as has been recognized by this Court, the line where the land actually borders the water is "wildly meandering" and constantly moving and changing. *Id.* at 515. Thus, determining where the privately-owned lands ended and where the state-owned tidelands began was seemingly impossible. At the time of *Cinque Bambini*, we recognized that the mean high water mark was found as a more constant boundary of necessity, and as a line that is ascertainable through established and accepted scientific methods. *Id.* "That mark is not

---

[7]By way of clarification, while "submerged lands" refers to lands "which remain covered by waters, where the tides ebb and flow, at ordinary low tides," "tidelands" refers to "lands which are daily covered and uncovered by water by the action of the tides, up to the mean line of the ordinary high tides." Miss. Code Ann. § 29-15-1(g), (h). *See also Phillips Petroleum*, 484 U.S. at 477.

[8]Miss. Const. art. 4, § 104 (1890) states that "[s]tatutes of limitation in civil causes shall not run against the State, or any subdivision or municipal corporation thereof."

a line observable on the ground, although it may be plotted by surveyors trained in the field. When plotted we confront the geographical reality of a continuous, unbroken line wildly meandering, to be sure, but reaching from Alabama on the east in uninterrupted sequence to Louisiana on the west." *Id.* at 515. The line separating the water from the land, which also separates private land from that land held in trust, changes over time in part due to accretions to the land, which can be natural deposits or artificial fill. Accretions include the gradual deposits of alluvial soil upon the margin of the water (gradual recession of the water can, of course, also change the line), or deposits of silt or sand over tidewaters adjacent to the shoreline due to artificial causes. *Harrison County v. Guice*, 244 Miss. 95, 108, 140 So.2d 838, 842 (1962).

¶13.   In *Guice*, this Court had to determine what the legal effect of these accretions would be.   At the time of *Guice*, we recognized that the rule was generally that the uplands owner is entitled to the title to accretions to his land, protecting the riparian or littoral owner's access to the water. *Id.* We found it irrelevant whether the accretions were the result of natural causes or artificial ones, attempting to ensure that a landowner's littoral rights would not be cut off. *Id.* "This reason is just as valid when the area adjacent to the upland owner is filled in or pumped up by acts of strangers to the upland title, as it is when the gradual deposit of alluvial soil raises the land adjacent to the upland owner.   In either event, the upland owner should be given title in fee to the new land so that he may have continued access to the water." *Id.* at 842-43. This rule was eventually modified when we overruled *Guice* in part in *Miss. State*

13

***Highway Comm'n v. Gilich***, 609 So.2d 367, 375 (Miss. 1992).[9]  In 1989, after our decisions in ***Guice*** and ***Cinque Bambini***, but before our decision in ***Gilich***, the state legislature enacted the Public Trust Tidelands Act, Miss. Code Ann. §§ 29-15-1, et seq., in an attempt to make a determination of the line of demarcation between land belonging to private landowners and land belonging to the public trust. ***Wiesenberg***, 633 So. 2d at 987.

¶14.    In its enactment of the Public Trust Tidelands Act, the legislature made unquestionably clear its intent and purpose. Section 29-15-3 provides:

> Declaration of public policy and purpose
> (1) It is declared to be the public policy of this state to favor the preservation of the natural state of the public trust tidelands and their ecosystems and to prevent the despoliation and destruction of them, except where a specific alteration of specific public trust tidelands would serve a higher public interest in compliance with the public purposes of the public trust in which such tidelands are held.
> (2) It is hereby declared to be a higher public purpose of this state and the public tidelands trust to resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and the upland property and to confirm the mean high water boundary line as determined by the Mississippi Supreme Court, the laws of this state and this chapter.

In ***Wiesenberg***, we set out legislative findings of fact relating to the enactment of the Public Trust Tidelands Act, as provided in the Editor's Note – Laws, 1989, ch. 495, § 1, effective from and after March 31, 1989:

---

[9] In ***Gilich***, we stated, "[O]n the basis of Section 95 ["no-donation of state-owned or state-controlled lands"] of the Mississippi Constitution we hereby overrule ***Guice*** insofar as it applies the doctrine of artificial accretion so as to render lands once a part of the public trust, the property of private land owners by the action of the government in artificially recovering such lands." 609 So.2d at 375.   However, as will be discussed in more detail, infra, our limited overruling of ***Guice*** in ***Gilich*** does not affect the outcome of today's case. ***Gilich*** was factually dissimilar to ***Guice,*** and likewise, to today's case.

SECTION 1. The Legislature finds that certainty and stability of the land titles of riparian and littoral property owners along the banks of the navigable rivers and waterways on the borders and in the interior of the state and along the shores of the tidally affected waters of the state are essential to the economic welfare of the state and to the peace, tranquility and financial security of the many thousands of citizens who own such lands; that a dispute has developed with respect to such lands bordering on tidally affected waters, calling into question titles and legal issues believed secure and determined from the date of statehood; that this dispute has cast a doubt and cloud over the titles to all littoral lands and all riparian lands along the rivers and shorelines of the coastal area to such a degree that land sales are being prevented, business and home purchasing has been made difficult or impossible, industrial financing based on such titles has become unavailable, and homeowners and other owners have been rendered apprehensive as to their security in their ownership. Economic growth and development in the coastal counties are at a virtual standstill, creating a constantly increasing and incalculable loss of dollars to the area as well as the loss of countless new jobs for the average citizens of this state. The Legislature finds that this dispute has already caused extensive harm, is intolerable, and immediate resolution is required and would serve the higher public purpose, in order that public trust tidelands and submerged lands may be utilized through their normal interface with the fast lands in furtherance of all the usual purposes of the trust.

The Legislature recognizes that it serves the interests of all the citizens of the state as well as the interests of each individual area and that when controversies and problems arise between divergent interests it becomes the duty and responsibility of the Legislature to balance these interests and reach equitable solutions which will create the least amount of harm to the individual citizens and the state as a whole. The Legislature finds, in accordance with justice and sound policy, that resolving the problems in the manner herein set out would create far less harm and be of greater benefit to the state and its citizens in terms of preventing economic loss, loss of jobs, loss of development, use and enjoyment of the tidelands and submerged lands, loss of industry and loss of revenue to the state than any benefits which would be derived from any attempt to completely rectify unregulated wetlands use which has occurred in the past, that the amount of damage, harm or loss that has occurred to the lands held in public trust since statehood is negligible compared to the benefit of resolving the problem, that the cost of any other solution is far in excess of the amount of public gain.

633 So.2d at 987-88. The statutory purpose was "to resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and the upland property and to confirm the mean high water boundary line as determined by the Mississippi Supreme Court, the laws of this state and this chapter." Miss. Code Ann. § 29-15-3(2).

### B.    An overview of the Public Trust Tidelands Act

¶15.    An overview of the Public Trust Tidelands Act is equally important as we consider today's case.[10]    Miss. Code Ann. § 29-15-7 and this Court's decision in *Wiesenberg*, 633

---

[10]In fact, we interject here various definitions which will be helpful to the reader. Miss. Code Ann. § 29-15-1 provides numerous definitions:

(a) "Commission" means the Mississippi Commission on Marine Resources.

(b) "Local tidal datum" means the datum established for a specific tide station through the use of tidal observations made at that station.

(c) "Mean high water" means the arithmetic mean of all the high waters occurring in a particular nineteen-year tidal epoch period; or for a shorter period of time after corrections are applied to the short term observations to reduce these values to the equivalent nineteen-year value.

(d) "Mean high water line" means the intersection of the tidal datum plane of mean high water with the shore.

(e) "Mean high water survey" means a survey of the intersection of the shoreline with the tidal datum plane of mean high water using local tidal datums and surveying methodologies approved by the commission. Methodologies shall include but not be limited to the "staking method," "the topographic method" and "tide coordinated aerial photography."

(f) "National map accuracy standards" means a set of guidelines published by the Office of Management and Budget of the United States to which maps produced

16

So.2d at 990-93, outline in detail the procedure to be used in determining a final map of Mississippi's public trust tidelands; however, restating here verbatim the procedure laid out in the Act and discussed at length in *Wiesenberg* would serve no useful purpose, and thus we will not do so.

¶16.    On the other hand, we will generally discuss the mapping procedure here, focusing on section 29-15-7 and *Wiesenberg*. The Secretary of State is to file a preliminary map depicting "the boundary as the current mean high water line where shoreline is undeveloped and in developed areas or where there have been encroachments, such maps shall depict the boundary as the determinable mean high water line nearest the effective date of the Coastal Wetlands Protection Act." Miss. Code Ann. § 29-15-7(1); *Wiesenberg*, 633 So.2d at 990.    This preliminary map is submitted to the chancery clerks of the coastal counties (Hancock, Harrison and Jackson), and each of the chancery clerks is to post the map in a public place in the clerk's office.    Miss. Code Ann. § 29-15-7(3).    The Secretary of State likewise is statutorily required to cause this preliminary map to be published in a newspaper having general circulation within each of the coastal counties; to publish a notice in three (3) public places in each coastal county; and to have the map available for public inspection in the office of the

by the United States government adhere.

(g) "Submerged lands" means lands which remain covered by waters, where the tides ebb and flow, at ordinary low tides.

(h) "Tidelands" means those lands which are daily covered and uncovered by water by the action of the tides, up to the mean line of the ordinary high tides.

Secretary of State. *Id.* For sixty (60) days after publication, comments and/or additional documentation may be received, with the Secretary of State having discretion to revise the map based on receipt of comments and/or documentation, though further revision is not statutorily mandated. *Id.* Section 29-15-7(4). The final certified map is to then be published, utilizing the same method of publication, and shall be filed in the land records located in the chancery clerk's offices in each of the three coastal counties.[11] Upon recordation, the map is final as to properties not subject to the trust; however, as to those properties subject to the trust, the Secretary of State, within one-hundred twenty (120) days of final adoption of the certified map, shall notify those property owners that their lands are subject to the public trust and are in violation of the trust. Any such property owner shall have six (6) months to negotiate a settlement with the Secretary of State. *Id.* Absent a settlement, the aggrieved property owner may commence suit in the appropriate chancery court. Section 29-15-7(5). Aggrieved parties have additional remedies as provided in section 29-15-7(6).[12]

¶17. Turning to today's case, and keeping in mind the facts and circumstances peculiar to this particular case, we emphasize that how the mean high water line is to be determined for the preliminary map depends on whether shorelines of the mapped areas are developed or undeveloped. In developed lands, as in today's case, the preliminary map "shall depict the

---

[11]Recognizing that Harrison County has two judicial districts with the county seat of the First Judicial District being Gulfport, and the county seat of the Second Judicial District being Biloxi, there would be filings in both offices. *See* Miss. Code Ann. § 9-1-39 (Rev. 2002).

[12]Again, this is but a generalized overview of the statutory mapping procedure. Other statutory requirements not discussed here must also be followed. The mapping procedure and boundary challenge procedure are set out in detail in section 29-15-7(1)-(6).

18

boundary as the determinable mean high water line nearest the effective date of the Coastal Wetlands Protection Act,"[13] which is July 1, 1973. Miss. Code Ann. § 29-15-7(1). The Secretary of State, in exercising discretion vested under the statute, may revise the preliminary map based on comments and additional documentation received during the statutory 60-day period, and prepare the final map accordingly. "Any comments indicating the presence of any unauthorized artificial filling on developed properties prior to July 1, 1973, should be reflected on the final map." *Wiesenberg*, 633 So.2d at 991.

¶18. Once the certified final map is filed, the Secretary of State is to determine which landowners are in violation of the public trust, meaning they occupy land that, because of the trust boundary, is actually the property of the State, and then notify those landowners by certified mail. Miss. Code Ann. § 29-15-7(4). Pursuant to the Act, after the notice is received by the landowners, the affected landowners are allowed a six-month period in which "to negotiate and settle differences with the Secretary of State" arising from the final map, also allowing for any extensions granted by the Secretary of State, in the exercise of discretion.

---

[13] Miss. Code Ann. § 49-27-1. Miss. Code Ann. § 49-27-5(a)(b) (Rev. 2003), as it existed and applied to today's case, defined "coastal wetlands" as "all publicly-owned lands subject to the ebb and flow of the tide; which are below the watermark of ordinary high tide; all publicly-owned accretions above the watermark of ordinary high tide and all publicly-owned submerged water-bottoms below the watermark of ordinary high tide" and includes "the flora and fauna on the wetlands and in the wetlands." In 2005, the legislature amended this statute by, inter alia, basically combining subsections (a) and (b) into a new subsection (a). The Coastal Wetlands Protection Act declared the public policy of this state to be "to favor the preservation of the natural state of the coastal wetlands and their ecosystems and to prevent the despoliation and destruction of them, except where a specific alteration of specific coastal wetlands would serve a higher public interest in compliance with the public purposes of the public trust in which coastal wetlands are held." Miss. Code Ann. § 49-27-3.

*Id.* The notice delivered by certified mail is to include an explanation of the procedures available to the affected landowners to resolve these disputes. *Id*. § 29-15-7(5). *See also id.* §§ 11-17-1, et seq. (Rev. 2004). The Secretary of State and the affected landowner may execute a boundary determination in a written agreement which would be final and binding to its parties after it is recorded in the proper chancery clerk's office where the property is located (in either Hancock, Harrison or Jackson Counties). *Id*. 29-15-7(4). The affected landowners who are unable to resolve their disputes via this statutory avenue may then seek judicial relief by filing suit within three years following receipt of the notice described above. *Id*. §§ 29-15-7(5)(6). If no action is taken by any adversely affected landowner within that time period, the boundary on the certified map is to become final. *Id*. § 29-15-7(6). The Act clearly provides that "[i]n any such action, the state shall have the burden of proof by a preponderance of evidence that any such land is subject to the trust." *Id*. § 29-15-7(5). The State carries this statutorily required burden of proof regardless of whether the judicial proceedings are commenced by the State or by the individual landowner. This Court has stated, "[a]fter the preliminary map is drawn using the mean high water line in developed areas as of July 1, 1973, the burden of proof is on the Secretary of State to show that any artificial accretion occurring prior to July 1, 1973, was not done pursuant to a constitutional legislative enactment and for a higher public purpose." *Wiesenberg*, 633 So.2d at 992.

### C. How the boundary was determined in this case

¶19. We now turn to the facts of today's case. The State filed its preliminary map in September of 1994. On November 14, 1994, Bayview and IPM submitted their comments and objections to the preliminary map. The State filed its final certified Map of Public Trust Tidelands on December 15, 1994. This final map had no changes incorporated into it based on the comments and objections that Bayview and IPM had submitted, but was instead identical to the preliminary map with regard to the Bayview property. On April 4, 1995, the Secretary of State sent out the notices required under the Act to three of IPM's predecessors in title. On June 7, 1995, Bayview and IPM filed their Notice of Protest and Dispute. Bayview and IPM filed their complaint on April 3, 1998, within the statutorily allowed three-year limitations period.

¶20. The trial court heard testimony from various witnesses, including engineers from Thompson Engineering, geologists from the Mississippi Office of Geology, experts in geography, experts in coastal surveying, as well as archeologists and land surveyors. The trial court also received into evidence various documents prepared by the experts. Based on the evidence presented at trial, the chancellor found that relevant, credible evidence appeared in the record to show where the last natural shoreline position existed. Specifically, the chancellor found:

> Based upon the totality of the credible, relevant evidence in this record, the Court finds by a preponderance of the evidence that (1) the 1851 coastal survey map (B-1) depicts the natural mean high water line, circa 1851, at the IPM site; (2) there is no credible evidence that the LNSP (Last Natural Shoreline Position) at the IPM site has been masked or placed beyond reasonable

21

discovery by hurricanes or dredging; (3) that between the 1880's and early 1900's there were massive unnatural, manmade alterations of the natural shoreline at the IPM site; (4) that such manmade alterations consisted of oyster shells and fill placed by IPM's canning company predecessors in interest; (5) that the highest probability LNSP at the IPM site is the TELNSP (Thompson Engineering Last Natural Shoreline [Meander] Position) as shown on Exhibit S-26; (6) that the TELNSP at the IPM site is credibly surveyed and depicted by reference to existing and known landmarks and the land lying north and east of the TELNSP is credibly surveyed, depicted, described and quantified. (Exhibits S161 and S179).

The chancellor thus found that the 1851 natural mean high water line was reliably ascertainable; that the last natural shoreline position was not beyond reasonable discovery; and, that manmade, artificial accretions occurred at the IPM site between the 1880's and early 1900's which changed the shoreline. The chancellor concluded:

> Having found by a preponderance of the evidence that the line which corresponds with the mean high water line at its last natural position at the IPM site at the moment of human intervention is the TELNSP and that all land lying bayward, i.e. north and east of said TELNSP is the result of artificial filling it follows as a matter of law that the boundary line separating State owned public trust tidelands and uplands owned by IPM is the TELNSP as surveyed and placed on the ground by [professional land surveyor] Michael Cassady. Title to all land lying north and east of said boundary line is confirmed in the State. Title to all lands claimed by IPM lying south and west of said line is confirmed in IPM.

### D.    The arguments on appeal

¶21.    Exactly what the State must prove (by a preponderance of the evidence) is "that any artificial accretion occurring prior to July 1, 1973, was not done pursuant to a constitutional legislative enactment and for a higher public purpose." *Wiesenberg*, 633 So.2d at 992. For example, if a landowner artificially accreted to his land to provide environmental protection or to allow docking of vessels and make fishing more efficient, this would serve a higher

22

public purpose of the trust. *Cinque Bambini*, 491 So.2d at 512 (citations omitted). In such cases, such an artificial accretion would be authorized and vest to the uplands title holder. On the other hand, for the land to vest in the trust, the Secretary of State must prove the accretions offend our state constitution and were not made for a higher public purpose. This should ordinarily be done "[a]fter the preliminary map is drawn using the mean high water line in developed areas as of July 1, 1973." *Wiesenberg*, 633 So.2d at 992. This is so because, in *Wiesenberg*, we affirmed that date as a *starting point* for determination of the mean high water line in developed areas. *Id.* at 986, 991 (emphasis in original). We no doubt emphasized that this date was not "a mandatory bench mark." *Id.*

¶22.    Bayview and IPM first point out that the State holds its tidelands and submerged lands in trust for two beneficiaries, members of the general public and private landowners with littoral and riparian rights under statute and common law. Miss. Code Ann. § 29-15-5. Next, Bayview and IPM, conceding that its land was in fact extended bayward by pre-1973 artificial accretions, contend now that the Secretary of State simply did not meet at trial the burden it carried, in that the State never showed that the artificial accretions were not done pursuant to a constitutional legislative enactment and for a higher public purpose. In fact, Bayview and IPM argue that the evidence the State presented shows that the accretions were consistent with the common law and the statutory law of the public trust. This Court has held the many public purposes of the trust to include "navigation and transportation, commerce, fishing, bathing, swimming, and other recreational activities, development of mineral resources, environmental

23

protection and preservation, the enhancement of aquatic, avarian and marine life, sea agriculture and no doubt others." *Cinque Bambini*, 491 So.2d at 512 (internal citations omitted). *See also Wiesenberg*, 633 So.2d at 988-89. Bayview and IPM argue that the Secretary of State had the burden to prove that not an inch of ground arose from the acts of strangers, including the state, and had the burden to prove that any accretions were not already vested in the upland owner by common or statutory law of the trust. IPM thus argues that because the State cannot meet its burden, the State cannot prove that the IPM accretions are subject to the trust.

¶23.   The State, on the other hand, argues that land that was once in trust, beginning upon Mississippi's admission to the Union, simply cannot be taken away from the trust. The State directs our attention to our holding that "once the state possesses public trust lands it is deemed to possess such property forever." *Gilich*, 609 So.2d at 374. This holding was based on our reading of Miss. Const. art. 4, § 95 (1890), which provides that "lands belonging to, or under the control of the state, shall never be donated directly or indirectly to private corporations or individuals." *Id.* The State further argues that because the mean high water line is naturally ambulatory, and because the statute recognizes this, the legal boundary moves with the mean high water line and where the trust boundary may have been at an earlier time becomes legally irrelevant. Miss. Code Ann. § 29-15-7(2). *See also Cinque Bambini*, 491 So.2d at 510-11.[14]   On the other hand, the State argues that the same cannot be said when the

---

[14]We held that "fee simple title to all lands naturally subject to tidal influence, inland to today's mean high water mark, is held by the State of Mississippi in trust. On the other hand,

24

water line ambulates from non-natural means. Private land can be artificially submerged, through trenching for example, and become subject to the tidal influence without becoming part of the public trust; likewise, private land can be artificially accreted to and abut further into the trust tidelands without making those filled tidelands a new part of the private land. The State may settle boundary disputes, charged with a duty to "hold to a minimum any incidental or accidental public trust losses." *Wiesenberg*, 633 So. 2d at 991.

¶24. The history of the IPM parcel of land is a fascinating one. In the early twentieth century, the Biloxi Canning Company, owned by a Croatian immigrant, Bernard Taltavull, occupied the land.[15] Mountains of oyster shells began occupying the land bordering the water of the Back Bay. Evidence presented at trial strongly infers that the enormous amount of shells played a vital role in eventually changing the shoreline. The State went to great lengths through the evidence it presented at trial (1) to show that land composed of artificial accretions lay between the natural land and the shore; and, (2) to determine the last natural shoreline position between the natural land and this accreted land bordering the water. However, the State failed to meet its burden of proving by a preponderance of the credible evidence that the accretions were not done pursuant to a constitutional legislative enactment

---

lands brought within the ebb and flow of the tide by avulsion or by artificial or non-natural means are owned by their private record titleholders." *Cinque Bambini P'ship v. State*, 491 So.2d 508, 510-11 (Miss. 1986). In other words, lands naturally submerged and subject to the tide belong to the State and lands artificially submerged and subject to the tide belong to the private landowners.

[15]Actually, the record reveals that an oyster canning company had occupied this site since 1881.

25

and for a higher public purpose. The State did present substantial credible evidence that went to prove the location of the last natural shoreline, but that substantial credible evidence did not show that the accretions to the IPM land were not done pursuant to a constitutional legislative enactment or for a higher public purpose. Not unlike part of the Secretary of State's argument in *Wiesenberg*, the argument of the Secretary of State today depends on using something other than the July 1, 1973, mean high water line as the beginning boundary delineation point to prevail. Nowhere in the statute or in the applicable case law does the last natural shoreline position determine the rights of the State or the private landowner in such a dispute. The Secretary of State should have begun with a preliminary map based on the July 1, 1973, mean high water line. This he did not do. In *Wiesenberg*, the Secretary of State argued in part that the appropriate date to determine the boundary on the preliminary map was the date on which the property was developed. Today, the Secretary of State uses as his beginning point the date Mississippi entered the Union in 1817. Following the history of the land up to present day, the Secretary of State relies on a map from 1851 to be of great evidentiary value and notes that after the early 1880s, the shape of the land bordering the water began to change because of artificial accretions. His charge is to use the mean high water line nearest July 1, 1973. In doing so, if the Secretary of State is able to present a different water line revealing unlawful accretions, the Secretary may unquestionably use this water line as opposed to the mean high water nearest July 1, 1973.

¶25. In settling other claims in similar boundary disputes, the Secretary admits to the agreed use of a 1954 seawall. Indeed the State points us to the time period when the land in question

26

was being developed, beginning in the early 1880s. We have warned against doing so. "If the developed areas were to be surveyed as of the date of development, the cost would be enormous. In addition it would create more lawsuits to determine exactly what constitutes development, what precise time did this development occur, who did it and why, and was it somehow authorized. The more efficient method is to determine the tidelands boundaries as of one point in time, therefore making it applicable to everyone at the same time, in the same manner, and with all having a right to be heard." *Wiesenberg*, 633 So.2d at 992-93.

¶26.    We have stated that we do not interpret the tidelands legislation to be a donation in violation of Miss. Const. art. 4, § 95 (1890), "but rather as a unified attempt by the Legislature to resolve the discord existing between the State and area landowners," and one we have held to be constitutional. *Wiesenberg*, 633 So.2d at 991. While, as the State points out today, it remains true that the July 1, 1973, line was never meant to be the final determination, we have affirmed its use as "a *starting point* in ascertaining the mean high water line in developed areas." *Id.* The State instead used a starting point which precedes 1973 by more than one and one-half centuries, the boundary line as it existed when Mississippi entered the Union in 1817. We have conceded this 1973 line to be imperfect, but one that should protect the public's interest as well as private ownership. *Id.* We quoted the chancellor's words in *Wiesenberg* to point out that "while a few may improvidently benefit from the 1989 Tidelands Act, and while a few may be harmed by it, the overall effect of the Act will not be to donate public property to private interests, but will act as a *long delayed* delineation between public and

27

private interests." *Id.* (emphasis in original). This is in accord with the purposes of the trust, reflected in the accompanying legislative history to Section 29-15-1 and in the text of Section 29-15-3, which declares that a higher public purpose of the state and of the Act is "to resolve the uncertainty and disputes which have arisen as to the location of the boundary between the state's public trust tidelands and the upland property and to confirm the mean high water boundary line as determined by the Mississippi Supreme Court, the laws of this state and this chapter." However this end can only be efficiently achieved if the procedures and burdens in the Act are heeded.

¶27. We found in *Wiesenberg* that there was "'no substantial interference with the original purposes of the trust imposed upon the state in connection with [the lands in question], and the development as authorized by the statutes is consistent with the public trust.'" *Id.* at 993 (quoting *Treuting v. Bridge & Park Comm'n of City of Biloxi*, 199 So.2d 627, 633 (Miss. 1967)). In *Treuting*, we held, "If the totality of the development promotes the public interest in general, the incidental private ownership of individual lots does not negate the comprehensive public purpose." 199 So.2d at 633. We reaffirmed this principle in *Wiesenberg*, where we relied on *Treuting* to find that a transfer of public property to a private party as a result of using the 1973 mean high water line in developed areas for preparing the preliminary map did not violate our state constitution where the transfer was incidental to achieving a higher public purpose, such as determining a definite boundary and stimulating the coast economy. 633 So.2d at 993. We noted that the "presence of any *unauthorized* artificial

28

filling on developed properties prior to July 1, 1973, should be reflected on the final map." *Id.* at 991 (emphasis added). When looking to the purposes of the trust as defined in the Act and in our case law, the presence of the accretions on the land at issue here certainly appear to be one of which is the promotion of commerce. The question we resolved in ***Wiesenberg*** is not unlike the one presented to us today. We recognized there that the Act "explicitly states that the common law doctrines pertaining to tidelands such as natural accretion and reliction continue to be applicable." *Id.* at 992. *See* Miss. Code Ann. § 29-15-7(2). We have stated, "There is no constraint on the final map to include or exclude any lands which have been artificially filled prior to 1973. However, if a landowner can show that this artificial filling was done pursuant to a legislative act, *or* for a higher public purpose, the 1973 mean high water line should remain in tact." ***Id.*** (emphasis added). The State, throughout the life of these civil proceedings, was shouldered with the preponderance of the evidence burden of proof. Here that burden was to show that any pre-1973 accretions were "not done pursuant to a constitutional legislative enactment *and* for a higher purpose." ***Id.*** (emphasis added). We unquestionably find that the State failed to meet that burden at trial and made no attempt to show on appeal how that burden was met.

¶28. Indeed, the totality of the record reveals that the artificial accretions (primarily oyster shells) constituted "a specific alteration of specific public trust tidelands" which "serve[d] a higher public interest in compliance with the public purposes of the public trust in which such tidelands are held." Miss. Code Ann. § 29-15-3(1). During the years of existence of the

oyster industry on this Back Bay location, the State maintained a program jointly with the oyster canneries to replant the oyster shells on reefs in the trust waters. For example, Miss. Code, 1930, § 6881, provided, inter alia, that twenty-five percent of all oyster shells which were taken from the public reefs were declared to be the non-transferrable property of the state and were to be delivered to the sea-food commission by stock-piling the shells at the place of business of the oyster dealer or factory. An oyster dealer's failure to comply with this statutory mandate was a misdemeanor subject to payment of a fine.

¶29. The State of Mississippi thus, not only acquiesced in, but mandated certain actions by the oyster industry resulting at least in large part to the artificial accretions which are the subject of today's litigation. Likewise a portion of these stockpiled oyster shells were used for replanting on reefs in the waters of the trust. Certainly this activity would not only be non-violative of our state constitution, but consistent with its provisions, and certainly would be consistent with our common law and legislative enactments. We recognized such higher public interests and purposes as fishing and the enhancement of aquatic, avarian and marine life and sea agriculture in *Wiesenberg*, 633 So.2d at 988-89 (citing *Cinque Bambini*, 491 So.2d at 512).

¶30. We now turn to the common law on accretions, which as discussed above, still applies to the Act. In *Harrison County v. Guice*, 244 Miss. 95, 107-08, 140 So.2d 838, 842-43 (1962), we held that accretions caused by third-party strangers to the upland title will vest in the upland owner, warning against the mischiefs that could occur if a stranger could sandwich himself between the water and upland owner, cutting off the upland owner's littoral rights.

Specifically, we stated, "where the owner of the upland had no part in creating the artificial addition or accretion, such owner acquires title in fee to such additional land. Reason and authority recommend this rule." *Id.* at 842. The land belonging to the private landowner in *Guice* was extended via accretions which were the result of authorized highway protection improvements by Harrison County, including a state-constructed seawall, in an effort to restore eroded land and prevent further erosion. *Id.* at 840. Guice once owned lands that bordered the water which partially eroded away as a result of a seawall; however, the State later restored that eroded land and actually added to the Guice property, extending it into the water farther than it had been before the erosion. The effect of our holding in *Guice* was to make the artificially accreted land, which before the erosion had been submerged lands belonging to the State in trust, part of the privately-owned Guice parcel.

¶31. As already noted, *Guice* was overruled in part by *Miss. State Highway Comm'n v. Gilich*, 609 So.2d 367, 375 (Miss. 1992), where we stated that *Guice* was overruled "insofar as it applies the doctrine of artificial accretions so as to render lands once a part of the public trust, the property of private land owners by the action of the government in artificially recovering such lands." In *Gilich*, the private landowners were claiming their oceanfront beach property was taken by the State without compensation in violation of the Mississippi Constitution when the State Highway Commission began building the "I-110 loop," a connecting route to I-10 which at its southernmost point is a ramp looping over the Gulf of Mexico and back to Highway 90. *Id.* at 369. We looked to the Fifth Circuit's reasoning in

31

*United States v. Harrison County*, 399 F.2d 485, 488 (5ᵗʰ Cir. 1968), to find that the ***Guice*** holding conflicted with Miss. Const. art. 4, § 95 (1890), which provides, "Lands belonging to, or under the control of the State, shall never be donated directly or indirectly, to private corporations or individuals, or to railroad companies. Nor shall such land be sold to corporations or associations for a less price than that for which it is subject to sale to individuals." 609 So.2d at 375. The Fifth Circuit in ***Harrison County***, 399 F.2d at 491, held that "[t]he common law doctrine of artificial accretion must yield to the command of the Mississippi Constitution as to the disposition of state owned lands" and we agreed in ***Gilich***. ***Id.*** Bayview and IPM now ask us to revisit ***Gilich*** and ***Guice*** and reconsider the logical consequences of this Court's rulings. While we today distinguish ***Gilich*** and thus find it inapplicable to today's case, we continue our discussion consistent with the invitation to revisit ***Gilich*** and ***Guice***.

¶32.    IPM argues that ***Gilich***'s overruling of ***Guice*** applied only insofar as it implicated Section 95 of the Mississippi Constitution, and thus applied only to the State of Mississippi as a stranger to upland title, and ***Gilich*** overturned ***Guice*** only in part because the facts supporting ***Guice*** were not present in ***Gilich***, i.e., Guice actually owned land south of the seawall that was covered by the county's actions, whereas Gilich did not. IPM emphasizes that the ***Gilich*** holding was a limited overruling of ***Guice*** because this Court stated that ***Guice*** was overruled "*insofar as it applies* the doctrine of artificial accretions so as to render lands once a part of the public trust, the property of private land owners *by the action of the government*

32

in artificially recovering such lands." *Gilich*, 609 So.2d at 375 (emphasis added). Treasure Bay asserts that the common law rule that accretions caused by third-party strangers to the upland title will vest in the upland owner is still the law in Mississippi, at least as to non-state third-party strangers to the upland title. *Guice*, 140 So. 2d at 842. We agree. We have already held that employing the Act to determine the boundary of the Public Tidelands Trust does not violate the donation clause of the Mississippi Constitution. *Wiesenberg*, 633 So.2d at 991. Also the statute and case law leave no doubt that the common law on accretions is to remain intact and work in conjunction with the Act. Holding otherwise would be akin to holding that piers, wharves, and other structures, constructed by private landowners as a statutory right under sections 49-15-9 and 49-27-7,[16] would inure to the benefit of the State, causing the State

---

[16]Miss. Code Ann. Section 49-27-7 allows an owner of riparian rights to construct and maintain piers, boathouses and similar structures if they are constructed on pilings that permit a reasonably unobstructed ebb and flow of the tide. "Riparian" refers to land bordering rivers and streams, and "littoral" refers to lands bordering lakes and oceans; however, the statute clearly refers to lands subject to the ebb and flow of the tide. *Id.* § 49-27-5(a). Ocean waters and connected bays would obviously be subject to the tide while rivers and streams would not ordinarily be. Therefore we must assume the legislature is loosely using the word "riparian" to mean both riparian and littoral. Also, "[t]he riparian owner may reasonably alter the wetland at the end of his pier in order to allow docking of his vessels." *Id.* § 49-27-7. "The sole right of planting, cultivating in racks or other structures, and gathering oysters and erecting bathhouses and other structures in front of any land bordering on the Gulf of Mexico or Mississippi Sound or waters tributary thereto belongs to the riparian owner . . . but no person shall plant in any natural channel so as to interfere with navigation, and such riparian rights shall not include any reef or natural oyster bed and does not extend beyond any channel." *Id.* § 49-15-9. "All bathhouses, piers, wharfs, docks and pavilions, or other structures owned by riparian owner are likewise the private property of such owner, who shall be entitled to the exclusive use, occupancy and possession thereof, and may abate any private or public nuisance committed by any person or persons in the area of his riparian ownership and may, for such purposes, resort to any remedial action authorized by law." *Id.*

to become the upland owner and holder of the littoral rights which accompany the real property.

¶33. Presented with a substantial question of law in this case, we are to review the issues de novo. In reviewing an opinion issued after a trial on the merits held before a chancellor, we are to overturn the findings of the chancellor only when they are manifestly wrong or when an erroneous legal standard has been applied. *Columbia Land Dev.*, 868 So.2d at 1011 (relying on *Vaughn*, 798 So.2d at 433; *Tucker*, 791 So.2d at 192). We are thus constrained to find that the findings of the chancellor were manifestly wrong in this case as an erroneous legal standard was applied, that being the use of the last natural shoreline position to determine the public trust boundary in developed areas. Our case law and statute are clear that the correct standard to use was the mean high water line nearest to July, 1 1973, and with this in mind the State was then required to prove by a preponderance of the credible evidence that the artificial accretions above this mean high water line were not done pursuant to a constitutional legislative enactment and for a higher public purpose. Inasmuch as the State wholly failed to meet its mandated burden of proof in this case, we find this issue, as asserted by Bayview and IPM, to have merit. Our disposition of this issue thus requires that we remand this case to the trial court, for the limited purpose of conducting a further evidentiary hearing consistent with our directives in order to determine the mean high water line nearest the effective date of the Coastal Wetlands Protection Act [Miss. Code Ann. §§ 49-27-1, et seq.]. The effective date of the Coastal Wetlands Protection Act was July 1, 1973. *See* Miss. Code Ann. § 29-15-7(1); *Wiesenberg*, 633 So.2d at 991. Once the chancellor has made this determination, the

34

chancellor shall then declare that all land lying north and east of this line shall be vested in the State as part of the public trust tidelands, and that all land lying south and west of this line as determined by the chancellor shall vest in Bayview and IPM.

## II. WHETHER THE 1928 PUBLIC LAND PATENT TO TALTAVULL WAS VALID

¶34.    The trial court held that the land patent from the State presumedly conveying the land in question to Taltavull, one of IPM's supposed predecessors in interest, was null and void for want of authority.    Taltavull had owned the IPM parcel of land in 1928 where he operated his Biloxi Canning and Packing Company and Bay View Crushing Company businesses engaged in oyster canning and crushing and disposing of the byproduct shells.    On July 11, 1928, the State of Mississippi issued a Public Land Patent to Taltavull, for consideration of $8.13.    The biennial report of the Commissioner of State Lands dating from July 1, 1927, to June 30, 1929, shows the Taltavull Patent to be 6.5 acres of land for a consideration of $8.13, the statutory minimum of $1.25 per acre as fixed by law in the 1906 Mississippi Code.    The trial court concluded that "[t]here is no credible evidence that the statutory minimum consideration paid by Taltavull for the patented land is so grossly inadequate that it constitutes a donation prohibited by Section 95 our State Constitution," and we agree.

¶35.    However, the trial court went further and found there were no later conveyances from Taltavull divesting him, his heirs or devises, of title to the patented land and there were no conveyances vesting IPM or its predecessors in title with any interest in the land.    Thus the trial court found the patent null and void for want of authority and violative of section 81 of our

35

state constitution ("Legislature shall never authorize the permanent obstruction of any of the navigable waters of the State").

¶36.    Bayview and IPM argue that Taltavull conveyed to Roy Rosalis and Virgilio DosSantos the upland and the part of the patent area filled.    However, the trial court found that no part of the patented land was included in the conveyance.    Bayview and IPM point out that the Chancery Court of Harrison County upheld a similar grant of such tidelands to the Beau Rivage, and argue that there is no material difference between the character of the tidelands, the grantee, or the public purposes of the trust that were served through the grant.    In *Money v. Wood*, 152 Miss. 17, 118 So. 357 (1928), this Court voided an attempted sale of public state land to a private party under what was then Section 2919 Miss. Code of 1906 (currently Miss. Code Ann. § 29-1-65).    This doctrine has been reaffirmed in *International Paper Co. v. Mississippi State Highway Dep't*, 271 So.2d 395, 399 (Miss. 1972).    *See also Cinque Bambini*, 491 So.2d at 521.    This Court held that "the state cannot convey in fee such rights to private owners for private purposes" because the Court found no authority given to the land commissioner to make such a conveyance.    *Money*, 152 Miss. at 29, 118 So. at 359 (relying on *Huber v. Freret*, 138 Miss. 238, 103 So. 3 (1925)).    Finding the deeds "absolutely void for want of authority on the part of the land commissioner to make such a sale," this Court reasoned that "land" in the statute at issue in that case meant dry land and not submerged land. *Id.* at 359-60.    This Court found there that the improvements planned by the purchaser for the land purchased were not for any public purpose but rather for "private enterprise, designed as

36

a scheme of financial advantage." *Id.* at 358. The trial court distinguished *Treuting,* where a public land patent to the Biloxi Park Commission was upheld, based on the facts of that particular case. The overall purpose of the conveyed, submerged land in *Treuting* was to be development of a large marina and some 46 miles of inland waterways fronted by residential property, with plans of better access to seafood packing plants for fishing boats, and a reduction of wave action on the shore of Biloxi, offering greater protection to the Biloxi harbor area. 199 So.2d at 631.

> When the project is completed, approximately twenty-seven percent of the land area of Deer Island will be devoted to public uses. Included in this classification is land for two 18-hole golf courses, two nine-hole courses, beaches, parks, green belts, waterways, schools, churches, marinas, and similar facilities. Another twenty percent of the island's surface will be allocated to such uses as street rights of way, utility easements, sewage treatment plants, water wells, and fire stations. The remaining fifty to fifty-three percent of the island will be devoted to residential, commercial and resort development. The completed project will offer 8,700 residential units for sale on the island. A fixed level bridge to the island will be built with a horizontal clearance of 125 feet and a vertical clearance of 50 feet. All of the some 280 vessels which make Biloxi their home port will be able to pass under this bridge.
> ************
> The cost of constructing the project is estimated to be some forty million dollars. The project will be financed by revenue bonds, secured by the sale of property on the island. Revenue from the island is expected to produce some forty million dollars.

*Id.*

¶37. In the end, this Court concluded in *Treuting* that this action by the State was an appropriate exercise of authority and consistent with the overall purposes of the public trust.

> [B]ecause the overall purposes of the proposed development of Deer Island promote a large number of public interests and uses, the incidental private ownership of parts of the development is not inconsistent with the public trust

37

in the submerged lands. In essence it is an effectual development and discharge of this trust.

************

The proposed development of Deer Island will promote navigation and fishing, and will give some protection to the Biloxi port. Navigation will be assisted by deeper channels. Biloxi fisheries will be better protected from storms and dangerous weather. Necessary additional housing for the geographically restricted City of Biloxi will promote additional manufacturing, and assist in the industrial development of the area.

*Id.* at 634.

¶38. Distinguishing today's case from *Treuting*, the trial court explicitly found that Taltavull's operating his business on the land in question served no more of a public purpose than the attempted purchaser in *Money*. Because of this, the trial court found the Taltavull patent to be void for want of authority (of the land commissioner), meaning IPM could not claim to be a successor in interest by deed.

¶39. IPM and Bayview point out that certain exceptions to the *Money* rule exist. IPM also draws our attention to *State v. Stockett*, 249 So.2d 388 (Miss. 1971), where this Court upheld a land patent conveying submerged swamp lands under the same statute at issue today. The reasoning in that case was that the land at issue in *Stockett* was rural rather than urban when conveyed, and validity of a land patent depends on the circumstances of the land at the time of conveyance; thus, this Court was able to distinguish the facts from those in other cases where land patents have been found invalid. *Stockett*, 249 So.2d at 391-94.

¶40. In the end, we find of significant import the trial court's application of *Money* and *Treuting* to today's case. The chancellor found this case to be factually aligned with *Money*

and distinguishable from *Treuting*; however, we find that the case sub judice is factually aligned with *Treuting* and distinguishable from *Money*. In *Money*, a private landowner, Wood, who had a home facing the Mississippi Sound on the beach at Biloxi, and who also had certain property on the west end of Deer Island, brought a suit to prevent private persons from developing property on the west end of Deer Island. 152 Miss. at 24, 118 So. at 358. These private persons had received title to this property from the state land commissioner. *Id.* "It appear[ed] that the [individuals] had undertaken to buy lands from the state of Mississippi lying under the waters of the Mississippi Sound for the purpose of constructing and erecting an artificial island, with hotels, boulevards, and residences for the private purposes of the [individuals]." *Id.* Wood claimed that this construction would "invade his rights as enjoyed under the laws of the state, and....would so interfere with his navigation, fishing, and other legitimate uses of the public waters which he enjoyed, and....the enjoyment of his property both on the beach and on Deer Island." 152 Miss. at 26, 118 So. at 358. This Court, in *Money*, found that the deeds in question were "void for want of authority on the part of the land commissioner to make the sale" because section 81 of our state constitution prohibited the sale of state lands of such character to "a person for *purely private business*." 152 Miss. at 30-31, 118 So. at 360 (emphasis added).

¶41. In today's case, Taltavull's 1928 public land patent from the State was at a time when his property (and the subject property in today's case) was being utilized, albeit by a private company, to promote the State's booming oyster industry. Taltavull and Biloxi Canning

39

Company, in concert with the State, and indeed as required by statute, was storing oyster shells on its property subject to disposition at the direction of the State, with a portion of the shells being used, inter alia, for paving roads and replanting in the natural oyster reefs of the tidelands. *See also* 1926 Miss. Laws, ch. 293; 1928 Miss. Laws, § 6881; 1944 Miss. Laws, ch. 288; 1958 Miss. Laws, ch. 195. Thus, clearly, the facts of today's case are more aligned with the facts of **Treuting**, as opposed to **Money**. The 1928 public land patent from the State to Taltavull was not violative of section 81 of our state constitution. This public land patent was certainly wholly consistent with the public purposes of the public trust tidelands. We thus find that the chancellor erred in finding that this conveyance was null and void for want of authority. We are likewise constrained from the record before us to find error in the chancellor's determination that there were no existing conveyances divesting Taltavull and his heirs of title to he subject property. The substantial credible evidence in the record reveals that the 1943 deed from Taltavull to Rosalis and DosSantos conveyed title to Taltavull's uplands, including the patented area, as substantiated by the deraignment of title submitted by Bayview and IPM. Therefore, we find that the chancellor likewise erred in finding that there were no existing conveyances divesting Taltavull and his heirs of title to the patented land and vesting title in Bayview's predecessors in title.

### III.   WHETHER IPM, BAYVIEW LAND, TREASURE BAY, OR THE MLADINICH FAMILY ENJOY ANY LITTORAL RIGHTS

¶42.   Littoral rights are the rights of landowners whose land is abutting an ocean, sea or lake rather than a river or stream, in which case the rights would be riparian, not littoral. *Stewart*, 815 So.2d at 1163 (internal citations omitted).   "Littoral rights are usually concerned with the use and enjoyment of the shore." *Id.* (internal citations omitted).   However, we have consistently held that littoral rights are not property rights per se, but are merely licenses or privileges. *Columbia Land Dev.*, 868 So.2d at 1012.   *See also Stewart*, 815 So.2d at 1163 (citing *Watts v. Lawrence*, 703 So.2d 236, 238 (Miss. 1997); *Gilich*, 609 So.2d at 375.   These licenses or privileges are also revocable. *Stewart*, 815 So.2d at 1163.   "Littoral and riparian property owners have common law and statutory rights under the Coastal Wetlands Protection Law which extend into the waters and beyond the low tide line, and the state's responsibilities as trustee extends to such owners as well as to the other members of the public."   Miss. Code Ann. § 29-15-5.   These rights are rights to reasonable use, subject to the State's interest in the lands. *State ex rel. Rice v. Stewart*, 184 Miss. 202, 237, 184 So.2d 44, 53-54 (1938) (citing *Money*, 118 So. 359).   Operating gaming facilities and a hotel would constitute reasonable use and encourage commerce on the water.   The Act and our case law make it clear that these rights are administered through the agency so designated by statute. *Watts*, 703 So.2d at 239.   "That agency's procedures and requirements must be followed." *Id.*   That agency is the Secretary of State. *Columbia Land Dev.*, 868 So.2d at 1013.   *See also* Miss. Code Ann. § 7-11-11.   These

littoral rights, essentially the right to use and enjoyment of the water, include many activities laid out in the statute. Miss. Code Ann. §§ 49-15-9, 49-27-7.

¶43. The trial court found that because the 3.05-acre of land made up of accretions was vested in the State, IPM had no land touching the water, except for small slivers of land on either side of the accreted parcel in question, and therefore no littoral rights to the water touching any of the land except its own, those small slivers flanking the accretions. "And the land must not only be contiguous to the water, but in contact with it. Proximity without contact is insufficient." *Ill. Cent. RR. v. Illinois*, 146 U.S. 387, 445, 13 S. Ct. 110, 115, 36 L. Ed. 1018, 1040 (1892). Because of our disposition of Issue I in favor of IPM, we find that the position of the Mladinich Family and Treasure Bay, which IPM and Bayview join, has merit, in that they do enjoy certain littoral rights to be determined by the chancellor upon conducting further proceedings consistent with our disposition of Issue I, above.

## IV. WHETHER THE STATE POSSESSES THE AUTHORITY TO REQUIRE LEASES AND COLLECT RENTS ON THE LAND

¶44. The trial court looked to both Miss. Code Ann. Section 29-1-107(2) and *Wiesenberg* to hold explicitly that Mississippi has authorized the Secretary of State to require leases and collect rents on submerged tidelands belonging to the State and held in trust. The thrust of the argument of Treasure Bay and the Mladinich Family with regard to this issue is that authorizing the State to do this constitutes judicial approval of a taking, offending the Constitutions of both Mississippi and the United States. To make this argument, Treasure Bay relies on our holding in *Guice*, where we held that a taking occurs if the State fills tidelands below the mean high

42

water line, cutting off the landowner's littoral rights. "It is a matter of common knowledge that the littoral rights incident to the ownership of beach front property along the Mississippi Gulf Coast is the most valuable attribute of such property. If the State, acting through the County, could 'pump up' the submerged bottoms adjacent to privately owned uplands, and thereby cut off direct access to the water, it could effectively destroy the value of much residential property as well as commercial and industrial water front property. Such taking of private property could not be accomplished without first paying just compensation. Mississippi Constitution, Sec. 17." *Guice*, 140 So. 2d at 842. This argument confuses two issues before the Court today. While this holding does have a material effect on the first issue in this case, it is of no consequence to the issue at hand. There is quite a difference between filling up tidelands, as illustrated in *Guice*, and requiring leases and rent for those submerged tidelands that belong to the State.

¶45. Our statutes and our case law provide this authority and leave no room for doubt. "The Secretary of State, with the approval of the Governor, may rent or lease surface lands, tidelands or submerged lands owned or controlled by the State of Mississippi lying in or adjacent to the Mississippi Sound or Gulf of Mexico or streams emptying therein, for a period not exceeding forty (40) years for rental payable to the state annually. However, the term of any lease of state public trust tidelands to a person possessing a license under the Mississippi Gaming Control Act shall be governed by the provisions of subsection (4) of this section." Miss. Code Ann. § 29-1-107(2)(a). We have addressed this issue before. "This statute unequivocally affords the Secretary of State the discretion to enter into a lease of the public tidelands." *Columbia*

43

*Land Dev.*, 868 So.2d at 1013. Further, in *Wiesenberg*, we clearly recognized that "the State from time to time has granted leases to allow private interests to use certain public trust lands." 633 So.2d at 989. To restate a principle, "the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Phillips Petroleum*, 484 U.S. at 475. This issue is without merit.

## V.    WHETHER THE STATE HAS THE AUTHORITY TO LEVY TAXES UPON THE LAND WHICH THE APPELLANTS LEASE

¶46.    The trial court looked to Miss. Code Ann. § 29-15-11 to find that the State and its political subdivisions have authority to assess and collect ad valorem taxes from persons or firms occupying land held by the State in the Public Tidelands Trust. The Appellants reiterate and incorporate their earlier arguments to convince this Court otherwise. "Upon the proper authorized leasing of any state public trust tidelands, or submerged lands, the lessee shall be responsible for any county or municipal tax levy upon the leasehold interest." Miss. Code Ann. § 29-15-11. This issue is without merit.

## VI.    WHETHER ANY STATE ACTION IN THIS CASE AMOUNTS TO AN UNCONSTITUTIONAL TAKING OF THE LAND

¶47.    On this issue, the Appellants collectively argue that the State's action has constituted a taking of littoral rights, offending the Fifth and Fourteenth Amendments to the U.S. Constitution and Miss. Const. art. 3, § 17 (1890). Because of our disposition of Issue I, above, this issue need not be addressed.

## VII. WHETHER THERE IS A DENIAL OF THE APPELLANTS' DUE PROCESS AND EQUAL PROTECTION OF THE LAWS

¶48. The arguments put forward by all of the Appellants here rests on the fact that the State granted 8.255 acres of land to the Beau Rivage because of obvious comparisons between the two casinos, or in other words, IPM was the victim of discriminatory action by the State. The trial court found that this occurred in part because the State had a rational basis for its settlements with the Beau Rivage and IPM exercised its statutory right to decline negotiation. The trial court found IPM was adamant that unless the State abandoned its claim completely, it would pursue its remedy in court. The State argues, at least in part, that because IPM did not attempt to reach amicable settlements like the Beau Rivage, it invited different treatment from that which the Beau Rivage received. However, because of our disposition of Issue I, above, addressing this argument becomes unnecessary.

## CONCLUSION

¶49. The Public Trust Tidelands Act serves a higher public purpose, and one this Court has held to be consistent with our State Constitution. That purpose is to settle age-old boundary disputes between land belonging to private landowners and that belonging to the State in trust. That the boundary line cannot be drawn exactly where it lay when Mississippi entered the Union and acquired its tidelands and submerged lands is naturally central to many disputes; however, the Act has laid out one final way to determine a line and we have upheld this method as one that protects the interests of the public and the affected private landowners as well as one that is designed to "put to rest the chaos that has plagued this subject matter and this

geographical area for many years." *Wiesenberg*, 633 So.2d at 991. Looking to the Act and *Wiesenberg*, we find that Bayview and IPM own all artificially accreted land lying south and west of the mean high water line nearest the date of July 1, 1973, to be determined by the chancellor. This restores the littoral rights to the landowners and settles any disputes concerning them. For these reasons, we reverse the judgment of the Chancery Court for the Second Judicial District of Harrison County and remand this case to the chancellor with directions to enter an appropriate judgment upon conducting further proceedings consistent with this opinion.

¶50.    **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., DIAZ, EASLEY, GRAVES AND RANDOLPH, JJ., CONCUR. DICKINSON, J., NOT PARTICIPATING.**