# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-00318-SCT

*C. DELBERT HOSEMANN, JR., IN HIS*
*CAPACITY AS SECRETARY OF STATE AND AS*
*TRUSTEE OF THE PUBLIC TIDELANDS TRUST,*
*THE STATE OF MISSISSIPPI, JACKSON*
*COUNTY, MISSISSIPPI AND CITY OF OCEAN*
*SPRINGS, MISSISSIPPI*

*v.*

*DAVID NEIL HARRIS, SR., VECIE MICHELLE*
*HARRIS AND CLYDE H. GUNN, III*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2012 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | HUGH D. KEATING |
| | JE'NELL BLOCHER BLUM |
| | PAULA N. STENNETT-YANCEY |
| | JESSICA MARIE DUPONT |
| | RYAN ANTHONY FREDERIC |
| | AMY LASSITTER ST. PE' |
| | ROBERT W. WILKINSON |
| ATTORNEYS FOR APPELLEES: | JOHN G. CORLEW |
| | VIRGINIA T. MUNFORD |
| | DAVID NEIL HARRIS, JR. |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | REVERSED AND REMANDED - 04/02/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND KING, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1. Abutting landowners, Clyde H. Gunn, D. Neil Harris, and Vecie Michelle Harris, filed

suit to confirm title to a sand beach located to the south of a road and seawall in Ocean Springs, Mississippi. The State of Mississippi ("the State"), the County of Jackson ("the County"), and the City of Ocean Springs ("the City") claim title to the same land. The lower court granted partial summary judgment in favor of Gunn and Neil and Vecie Harris (Harris) and found that the sand beach was not public trust tidelands. The chancellor then vested title to the sand beach in fee simple in Gunn and Harris, subject to prescriptive easements to the City and County for maintenance.

¶2. The State, County, and City appeal and raise these issues:

I. Whether the trial court erred in granting partial summary judgment on the tidelands issue.

II. Whether the chancellor erred in denying the State's Motion to Dismiss for expiration of the statute of limitations under the Tidelands Act.

III. Whether the chancellor erred in confirming fee simple title to the sand beach in Gunn and Harris.

IV. Whether the chancellor properly excluded the expert testimony of Cole, Schwartz, and Compton.

V. Whether the chancellor erred in denying the County's Motion in Limine to exclude evidence based on Corlew's statements in a companion case.

VI. Whether the chancellor erred in allowing testimony on individual statements of a County supervisor.

VII. Whether the chancellor erred in holding the County and City failed to establish title to the disputed property by statute, adverse possession, or public prescriptive easement.

### FACTS AND PROCEDURAL HISTORY

¶3. This is a title suit affecting significant public and private interests. Gunn and Harris

each own beachfront property in an area known as "East Beach" in Ocean Springs, Mississippi. Starting from the Mississippi Sound going north, there is marsh grass, a sand beach, a seawall, a road, and the yards of the Gunn and Harris properties.

¶4. Gunn and Harris previously filed for an injunction to prevent the City of Ocean Springs from constructing a sidewalk on the sand beach. The chancellor granted a permanent injunction that prevented the City from constructing the sidewalk but refrained from drawing property lines or declaring ownership. This Court vacated the chancellor's grant of a permanent injunction and remanded the case with instruction to continue the original preliminary injunction pending determination of ownership of the disputed property.

¶5. Gunn and Harris then each filed suit in the Chancery Court of Jackson County to quiet and confirm title to the sand beach. Because Neil Harris was a sitting chancellor in Jackson County, all Jackson County chancellors recused themselves. Special Chancellor Robert Lancaster was appointed.[1] The actions were consolidated first for discovery and later for all purposes. Gunn and Harris filed a Motion for Partial Summary Judgment as to whether the sand beach was considered tidelands under the Public Trust Tidelands Act. The State responded with a Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6), claiming that Gunn and Harris were outside the statute of limitations under the Tidelands Act. At the hearing for the partial summary judgment motion, Gunn and Harris moved to strike and exclude the affidavit of George M. Cole, a licensed surveyor, who was to testify that the Gunn and Harris deeds indicated the 1916 shoreline was inland of the current seawall.

---

[1]Before Special Chancellor Lancaster was appointed, two other special chancellors were appointed, Billy G. Bridges and William J. Lutz, and each recused himself.

Special Chancellor Lancaster granted the motion to strike Cole's affidavit, concluding that the affidavit did not comply with Mississippi Rule of Civil Procedure 56 and did not include admissible evidence.

¶6. On August 16, 2012, the chancellor granted the Motion for Partial Summary Judgment, holding that the boundary of the tidelands was the mean high water line closest to July 1, 1973, and ruling that the State had failed in its burden to produce admissible evidence showing the boundary was not this line.[2] The chancellor also denied the State's Motions to Dismiss, ruling that motions to dismiss were not proper avenues to determine statute of limitations issues. The chancellor filed an Addendum to Opinion on the partial summary judgment ruling on August 20, 2012, addressing the difference between the present case and *Gilich*.[3] The chancellor recognized that there was a dilemma between the Tidelands Act and the Harrison County beaches, but reaffirmed his original opinion and found that, unlike in *Gilich*, the State in this case did not produce admissible evidence that the sand beach was created by the filling of tidelands. The State then filed an Interlocutory Appeal petition on the partial summary judgment ruling, which the County and City joined. On October 29, 2012, this Court denied the Petition for Interlocutory Appeal.

¶7. A trial commenced on October 29-31, 2012, to determine the County's and City's adverse possession and public prescriptive easement claims. The chancellor confirmed and

---

[2]July 1, 1973, is the date of the enactment of the Coastal Wetlands Protection Act, which the Public Trust Tidelands Act uses to determine the boundary between private property and public tidelands in developed areas.

[3]*Mississippi State Highway Comm'n v. Gilich*, 609 So. 2d 367 (Miss. 1992).

quieted title to the sand beach in Gunn and Harris, subject to prescriptive easements for the County and City. The court held the State, County, and City failed to prove adverse possession or public prescriptive easement by clear and convincing evidence.[4] The court found that the County had a prescriptive easement in maintaining the sand beach for seawall protection and the City had a prescriptive easement for road maintenance.

¶8.     The court denied the City's Motion to Amend or Alter Judgment or in the Alternative for New Trial. The State, County, and City each appeal.

## DISCUSSION

¶9.     "The standard of review for a trial court's grant or denial of a motion for summary judgment is de novo." *Young v. Smith*, 67 So. 3d 732, 741 (Miss. 2011) (citations omitted). "The evidence is viewed in the light most favorable to the party opposing the motion." *Davis v. Hoss*, 869 So. 2d 397, 401 (Miss. 2004). The moving party has the burden of demonstrating no genuine issue of material fact exists. *Id.* Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Brent Towing Co., Inc. v. Scott Petroleum Corp.*, 735 So. 2d 355, 358 (Miss. 1999).

**A. Motion to Strike Cole Affidavit**

¶10.    A trial court's grant of a motion to strike an affidavit is subject to an abuse-of-

---

[4]The City argued that East Beach had been used by the public for more than ten years; therefore, the public held a prescriptive easement to continue using the beach. The chancellor found that the public could continue using the beach only upon the permission of Gunn and Harris.

discretion standard of review. *Trustmark Nat'l Bank v. Meador*, 81 So. 3d 1112, 1116 (Miss. 2012) (citing *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 832 (Miss. 2009)).

¶11.    The State filed Dr. George Cole's affidavit in response to the Motion for Partial Summary Judgment on July 24, 2012, the day before the hearing. Dr. Cole's affidavit stated that he had examined evidence relating to the shoreline on East Beach. In Dr. Cole's opinion, before the seawall was constructed, the shoreline was inland of the seawall's location, and following the construction of the seawall and public renourishment of the beach, the shoreline has been seaward of the seawall. Dr. Cole came to this conclusion using several surveys to locate the shorelines in 1822 and in 2012, and comparing the shorelines to the location of the existing seawall. Attached to the affidavit, Dr. Cole included an aerial photograph printed from the program "Google Earth" with marked lines that represented the opinions Dr. Cole stated in the affidavit.

¶12.    Gunn and Harris objected to the affidavit, arguing that the affidavit was untimely under Rule 56(c) and that the affidavit included opinions outside of the opinions identified in the State's Designation of Expert Witnesses, in violation of Mississippi Rule of Civil Procedure 26. The trial court directed the parties to file briefs on whether or not Dr. Cole's affidavit should be excluded. The chancellor stated, "[t]he objection, as I understand it from Mr. Corlew is violation of the discovery aspect in your disclosure designation of experts you had to set out the opinions that you were going to use him for."

¶13.    Under Mississippi Rule of Civil Procedure 26, a party may use interrogatories to

require another party to identify expert witnesses expected to testify at trial, the subject matter the expert will testify on, the substance of the facts and opinions, and a summary of the grounds for each opinion. M.R.C.P. 26(b)(4). The December scheduling order did not require the designation of experts to be made pursuant to Rule 26. The order merely stated that the defendants must designate experts on or before February 2, 2012, and that discovery ended March 15, 2012. A discovery request must first be made before a violation of a discovery request can occur. *City of Jackson v. Perry*, 764 So. 2d 373, 384 (Miss. 2000). Rule 26(b)(4) clearly states that expert facts and opinions can be required through interrogatories. It is undisputed that Gunn and Harris did not propound interrogatories. Because no interrogatories were propounded imposing a duty to supplement expert opinions, the motion to strike Dr. Cole's affidavit for a discovery violation had no basis.

¶14.    The trial court instead excluded Dr. Cole's affidavit because the chancellor found the affidavit was unreliable and not admissible under Mississippi Rule of Civil Procedure 56. However, the chancellor did not instruct the parties to brief this issue. The chancellor instructed the parties to brief whether Dr. Cole's affidavit was a violation of discovery under Rule 26. "[W]hen an expert's opinion is challenged, the party sponsoring the expert's challenged opinion must be given fair opportunity to respond to the challenge. The provision of a fair opportunity to respond is part of the trial court's gate[-]keeping responsibility." *Sanders v. Wiseman*, 29 So. 3d 138, 143 (Miss. Ct. App. 2010) (quoting *Kihullen v. Kansas City Southern Ry.*, 8 So. 3d 168, 174 (Miss. 2009) (citations omitted)). The chancellor did not give the State a fair opportunity to respond to the challenge under Rule 56. Thus, the trial

court abused its discretion in granting the motion to strike Dr. Cole's affidavit. If this issue arises on remand, the court should allow the State an opportunity to respond prior to ruling on the motion to strike.

**B. Tidelands**

¶15.    The court then granted partial summary judgment in favor of Gunn and Harris, reasoning that, under the Tidelands Act, the mean high water line as of July 1973 determined the boundary between the public trust tidelands and the Gunn and Harris properties. The mean high water line closest to that date showed the boundary of the tidelands seaward of the current water line. The chancellor ruled that, in order for the line to be the toe of the seawall as the State contends, the State was required to show, and failed to do so, that the sand beach was not constructed pursuant to a legislative enactment and for a higher public purpose.[5] In the alternative, the chancellor stated that, under **Gilich**, the State failed to produce admissible evidence that the sand beach was created by filling in tidelands up to the seawall and that the State intended to retain full title to the filled land.[6]

¶16.    In order to fully analyze the issue, a look into the history of the tidelands is necessary. When admitted into the Union, the State of Mississippi was granted title to lands subject to the ebb and flow of the tide and up to the mean high water level, without regard to navigability. The Mississippi Constitution states, "[l]ands belonging to, or under the control

_____

[5]"[A]nd with this in mind the State was then required to prove by a preponderance of the credible evidence that the artificial accretions above this mean high water line were not done pursuant to a constitutional legislative enactment and for a higher public purpose." ***Bayview Land, Ltd. v. State ex rel. Clark***, 950 So. 2d 966, 984 (Miss. 2006).

[6]***Miss. State Hwy. Comm'n. v. Gilich***, 609 So. 2d 367 (Miss. 1992).

8

of the State, shall never be donated directly or indirectly, to private corporations or individuals . . . ." Miss. Const. art. 4, § 95.

¶17.    After hurricanes repeatedly washed away roads parallel to the Mississippi Sound, the Legislature passed an Act in 1924 that authorized certain counties to erect sea walls or other structures for the protection of public roads.[7] Section three of the Act authorized the boards of supervisors in these counties to exercise eminent domain to procure the right of way for these seawalls and beaches, among other things, to protect the highways. In 1938, this Court held that the State was absolute owner of the beds of its shores of the sea, wherever the tide ebbs and flows, as trustee for the people, and that the State had no authority to convey title of the land below the high-water mark. *State ex rel. Rice v. Stewart*, 184 So. 44, 50 (Miss. 1938).

¶18.    This Court then considered the *Guice* case, where a landowner with beachfront property and Harrison County each claimed title to a sand beach located to the south of the seawall. *Harrison Cnty v. Guice*, 140 So. 2d 838 (1962). Harrison County acquired an easement to construct and maintain a seawall over the Guice property. *Id.* at 839. South of the seawall was around 200 feet of uplands until the mean high water line and then a forty-foot beach. *Id.* Over time, wave action, partly due to the construction of the seawall, eroded some of the property south of the seawall. *Id.* Harrison County then dredged sand from the bottoms of the Sound and pumped in the sand over the area south of the seawall to create another sand beach for road and seawall protection. *Id.* This Court found title to the sand

---

[7]1924 Miss. Laws ch. 319.

beach in Guice, holding that Harrison County had no title in lands that always remained above the mean high tide line. *Id.* at 842. As to the artificially created lands, this Court ruled that an owner acquires fee simple title to additional lands when the owner has no part in creating the artificial additions or accretions. *Id.*

¶19.    Following the *Guice* decision, the United States brought suit against Harrison County for enforcement of the federal contract entered into for the construction of the Harrison County sand beaches. *United States v. Harrison Cnty., Miss.*, 399 F. 2d 485 (5th Cir. 1968). As stated in *Guice*, in 1947, a hurricane destroyed a considerable portion of Highway 90 and caused more than $18,000,000 worth of damage, mostly to Harrison County. *Id.* at 488. Harrison County entered into a contract with the United States to procure federal funds for construction of a sand beach. *Id.* at 490. In turn, Harrison County agreed to dedicate the beach for the perpetual use of the general public. *Id.* at 488-89. The sand beach was constructed on bottoms that were then underwater. *Id.* at 489. After the *Guice* decision, several people were forcibly denied access to the beach, and the United States brought suit. *Id.* at 490. The Fifth Circuit chose not to follow *Guice*, reasoning that stare decisis was not appropriate because the County denied that it had agreed to or was attempting to operate a public beach. *Id.* at 491. The Fifth Circuit next opined that the *Guice* decision granted private landowners title to land, free of charge, which "unquestionably belonged to the State when the improvements began." *Id.* The Court held that the Mississippi Constitution overruled the common law and  required the filled tidelands forming the sand beach to belong to the State in trust for the general public. *Id.*

10

¶20.    In July 1973, the Legislature enacted the Coastal Wetlands Protection Act to preserve the natural state of coastal wetlands, except where alteration would serve a higher public interest in compliance with the public purposes of the public trust.[8]

¶21.    A suit was brought afterward to determine the inland boundary of the tidelands. ***Cinque Bambini P'ship. v. State***, 491 So. 2d 508 (Miss. 1986). Cinque Bambini held record title to 140 acres of land. *Id.* at 511. The State claimed the property as tidelands. *Id.* Ninety-eight of the 140 acres consisted of two lakes created by dredging fill material for construction of Highway I-10. *Id.* at 510. The remaining forty acres consisted of the north branch of Bayou LaCroix and eleven small drainage streams. *Id.* Cinque Bambini argued that the State held title to tidelands only under navigable waters. *Id.* This Court determined fee simple title to lands naturally subject to the tide were held by the State in trust, while lands brought within the ebb and flow of the tide by avulsion or artificial or nonnatural means remained with the private titleholders. *Id.* at 510-11. This Court granted title to the ninety-eight acres of lakes created by dredging in Cinque Bambini and held that the remaining forty acres consisted of tidelands. *Id.* The United States Supreme Court then affirmed this Court's

---

[8]Mississippi Code Section 49-27-3 states:

It is declared to be the public policy of this state to favor the preservation of the natural state of the coastal wetlands and their ecosystems and to prevent the despoliation and destruction of them, except where a specific alteration of specific coastal wetlands would serve a higher public interest in compliance with the public purposes of the public trust in which coastal wetlands are held.

Miss. Code Ann. § 49-27-3 (Rev. 2012).

decision in *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988) (reasoning that, regardless of petitioners having long been record title holders and paying taxes on the forty acres, these facts did not change the outcome that the lands at issue became the property of the State upon its admission to the Union in 1817).

¶22.    Vast uncertainty continued to surround the boundary between public tidelands and private ownership, and  the Public Trust Tidelands Act of 1989 was codified to help resolve the dispute.[9] Miss. Code Ann. § 29-15-3(2) (Rev. 2010). The Tidelands Act reaffirmed that tidelands are held in trust by the State of Mississippi for the use of all the people. Miss. Code Ann. § 29-15-5(1) (Rev. 2010). The Act directed the Secretary of State to prepare a Preliminary Map of the tidelands held in trust. Miss. Code Ann. § 29-15-7(1). Where the shoreline is undeveloped, the tidelands boundary was to depict the current mean high water line. *Id.* In developed areas or areas with encroachments, the boundary was to be the mean high water line nearest the date of the Coastal Wetlands Protection Act.[10] *Id.* Once the Secretary of State created the preliminary map, the map was transmitted to each chancery clerk of the coastal counties. Miss. Code Ann. § 29-15-7(3). The chancery clerks were to post the map in a public place. *Id.*

¶23.    After posting the preliminary map, there was a sixty-day period for submission of comments. Miss. Code Ann. § 29-15-7(4) (Rev. 2010). The Act directed the Secretary of State to revise the map accordingly within twenty days. *Id.* The final map was published after

---

[9]The Act is codified in Sections 29-15-1 through 29-15-23 of the Mississippi Code.

[10]The Coastal Wetlands Protection Act was effective July 1, 1973.

the twenty-day period and recorded in the land records of each county. *Id.* The Secretary of State was required to find landowners who violated the trust within 120 days and issue notice by certified mail. *Id.* The notice informed the landowner of a three-year period to dispute the boundary on the final map. *Id.* After three years, the Secretary of State's map would be final unless the landowner submitted a contrary claim. *Id.*

¶24. After the Tidelands legislation, this Court revisited and reversed *Guice*, finding that the sand beach below the seawall in Harrison County was held in trust by the State as tidelands. *Miss. State Hwy. Comm'n. v. Gilich*, 609 So. 2d 367, 374 (Miss. 1992).[11] The Giliches' deed stated that the southern boundary of the property was the Gulf of Mexico. *Id.* at 369-70. It was uncontested that Harrison County constructed the sand beach at issue. *Id.* at 370. This Court overruled *Guice* as to artificially created lands, holding that, under the Mississippi Constitution, "once the state possesses public trust lands it is deemed to possess such property forever." *Id.* at 375. Lands not in tidelands in 1817 could become tidelands via the natural process of accretion or the general rising or expansion of the tide. *Id.* Remanding the case, this Court stated that the Giliches owned no part of the disputed property unless it was established that a sand beach continually existed above the mean high tide line prior to the construction of the beach by Harrison County. *Id.* at 374.

¶25. In the next major tidelands case, the Secretary of State challenged the constitutionality of the Tidelands Act. *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 986 (Miss. 1994).[12] The

---

[11]The Tidelands Act was not mentioned in this case.

[12]The Secretary of State was concerned with protecting the public trust and conceded that the legislation easily could be declared constitutional, but for the use of the 1973 mean

chancery court found the Tidelands Legislation constitutional and the State appealed. *Id.* This

Court expressed the need for resolving boundary disputes along the coastline, stating the

tidelands uncertainty impeded property development and financial transactions. *Id.*

> We concede that basing the mean high water line as of 1973 will not produce
> a perfect line, but after the Secretary of State incorporates all comments
> concerning any artificial changes and applies his discretion, the plan will
> produce a tidelands map that protects the public's interest as well as private
> ownership and hopefully put to rest the chaos that has plagued this subject
> matter and this geographical area for many years. The Secretary of State, after
> mapping, hearing comments and applying discretion, must hold to a minimum,
> any incidental or accidental public trust land losses. In upholding this
> legislation, we interpret the use of the July 1, 1973, date as a starting point in
> ascertaining the mean high water line in developed areas. Contrary to the
> Secretary of State's interpretation, this date is not a mandatory bench mark.
> Rather, the preliminary map shall be drawn as it existed on July 1, 1973, and
> all interested parties, including adjacent landowners, the public, and the
> Secretary of State, will have sixty days in which to submit comments which
> may be used to adjust the final map. Any comments indicating the presence of
> any unauthorized artificial filling on developed properties prior to July 1, 1973,
> should be reflected on the final map. This means that the Secretary of State
> may also incorporate his own comments into the final map. This vast
> discretion gives the Secretary of State a superior voice in finalizing the map.

*Id.* at 991-92. This Court acknowledged the Secretary of State's vast discretion in finalizing

the tidelands map, and that this discretion was integral to the constitutionality of the

Tidelands Act. *Id.* at 991. In the Secretary of State's discretion, the final map could include

or exclude lands artificially filled prior to 1973, "[h]owever, if a landowner can show that

this artificial filling was done pursuant to a legislative act, or for a higher public purpose, the

1973 mean high water line should remain in tact." *Id.*

---

high water line in developed areas. The Secretary of State argued that the use of the 1973
line would result in a "donation" of public trust property, making the Tidelands Act
unconstitutional.

14

¶26. The last major tidelands case was in 2006, in which the Imperial Palace casino obtained various governmental permits that allowed the casino to build a hotel and garage on land bordering Biloxi Back Bay. *Bayview Land, Ltd. v. State ex rel. Clark*, 950 So. 2d 966 (Miss. 2006). Artificial accretions, due in great part to an accumulation of oyster shells from canning companies, extended the land seaward over many years, adding more than three acres to the shoreline. *Id.* The State, along with the oyster canneries, maintained a program to replant the oyster shells on reefs in the trust waters. *Id.* at 982. After the Secretary of State released the preliminary map showing these artificial accretions as trust land, Imperial Palace submitted objections to the boundary line. *Id.* at 977. In the Secretary of State's final map, the boundary line did not change. *Id.* at 978. The Secretary of State sent certified notice to Bayview and Imperial Palace informing the parties of a violation of the Tidelands Act, and both parties filed a complaint claiming ownership of the land. *Id.* This Court held that the State failed to prove by a preponderance of credible evidence that the artificial accretions above the mean high water line were not done pursuant to a constitutional legislative enactment and for a higher public purpose. *Id.* at 984. Therefore, the boundary of the tidelands was the mean high water line closest to July 1, 1973, and the case was remanded to determine the boundary via that line. *Id.* at 985.

¶27. In the instant case, the State argues summary judgment was inappropriate because the trial court imposed a higher burden than appropriate on a summary judgment motion. The State argues that the Secretary of State had discretion in determining the boundary of public trust tidelands, and the toe of the seawall was the correct boundary line on East Beach. The

State also argues that material issues of fact existed as to whether the sand beach was manmade and whether the sand beach was constructed by filling in tidelands. In contrast, Gunn and Harris argue that there are no issues of material fact because the Secretary of State was limited in his discretion, and that the correct tidelands boundary on East Beach is the mean high water line closest to July 1973. This line shows the boundary of the tidelands as seaward of the sand beach. In addition, Gunn and Harris argue that the sand beach is natural, not manmade, and has always been in that location.

¶28. The State produced into evidence a letter dated January 21, 1954, from the Jackson County Board of Supervisors to the District Engineer from the Mobile District of the Corps of Engineers, which stated, "The attached map indicates the location of proposed sand beaches to be constructed at Ocean Springs, Miss., with material dredged from the borrow areas designated on the map." The map refers to both East Beach and Front Beach.

¶29. Another letter entered into evidence dated January 25, 1954, from the Mobile Corps of Engineers to the Jackson County Board of Supervisors, stated, "You are hereby authorized by the Secretary of the Army to construct a sand beach 200 to 300 feet wide by 11,700 feet long, *in the Mississippi Sound*, fronting Ocean Springs, Mississippi." (Emphasis added.) Gerald McWhorter, Assistant Secretary of State for Public Lands, stated in his Rule 30(b)(6) deposition that following the passage of legislation, seawalls were built and sand beaches were pumped in *on the tidelands* in front of the seawalls. (Emphasis added.)

¶30. Aerial photographs of East Beach from 1942 and 1958 also were entered into evidence. The chancellor found that both photographs showed a sand beach and an existing

16

road. The State argues that the photographs were on different scales and that comparison of the two to scale would reveal the construction of a sand beach in 1954.

¶31. Also in evidence was a Public Trust Tidelands Lease that Gunn entered into on June 22, 2009, authorizing Gunn to build a pier in front of his property. The lease stated:

> LESSEE agrees to maintain free public access to the open water portion of LEASE PREMISES subject to reasonable actions necessary to ensure the safety and convenience of all users. LESSEE may prohibit unauthorized boats from anchoring to his structures. *LESSEE agrees that the adjacent sand beach from the seawall to the mean high water mark is Public Trust Lands and shall be open to public use and public access.*

(Emphasis added.)

¶32. Additionally, the legend on both the preliminary and the final map the Secretary of State prepared clearly states, "Denotes approximate location of mean high water line in areas where the current location of said line (or the toe of the seawall in areas where beach renourishment has occurred) is the boundary of public trust lands." This Court has repeatedly held that the use of the 1973 starting point is subject to state common law regarding tidelands, submerged lands, and riparian and littoral lands. *Secretary of State v. Wiesenberg*, 633 So. 2d 983, 986 (Miss. 1994); *see also Stewart v. Hoover*, 815 So. 2d 1157, 1162 (Miss. 2002).

¶33. In the chancellor's addendum, after further analyzing *Guice*, he opined that it would not be reasonable to find that the Legislature intended to transfer what previously had been public beaches to abutting landowners. The chancellor found that the difference between the Harrison County beaches and the Jackson County beaches is that the State failed to produce admissible evidence that East Beach was created by filling tidelands. "Where doubt exists

17

as to whether there is a genuine issue of material fact, the trial judge should err on the side of denying the motion and permitting a full trial on the merits." ***Prescott v. Leaf River Forest Products, Inc.***, 740 So. 2d 301, 309 (Miss. 1999). This is a title suit that greatly affects both private and public interests. Summary judgment should be granted with great caution. ***Simpson v. Boyd***, 880 So. 2d 1047 (Miss. 2004) (citation omitted).

¶34.	It is undisputed that the mean high water mark closest to July 1, 1973, is seaward of the sand beach. However, this Court's holding in ***Gilich*** and the Fifth Circuit's holding in ***Harrison County*** show that the 1973 water line is not controlling with regard to sand beaches created by filling in tidelands. The State created genuine factual issues by producing evidence supporting the conclusion that East Beach was constructed by filling in tidelands. The State produced expert affidavits and testimony and official letters authorizing the creation of a sand beach in Ocean Springs by filling in tidelands. The State additionally produced a tidelands lease, which Gunn himself signed, stating that Gunn agreed that the beach was considered tidelands held in trust by the State and open to public use. "Motions for summary judgment may not be used to determine or decide issues of fact, only to decide whether there are any material fact issues to be tried." ***American Legion Ladnier Post [Number] 42, Inc. v. City of Ocean Springs***, 562 So. 2d 103, 106 (Miss. 1990). The burden of demonstrating that no genuine issue of material fact exists is on the movant. Gunn and Harris failed in their burden to show that there were no material issues of fact to be determined.

¶35.	Therefore, partial summary judgment was inappropriate and is reversed. Of necessity,

18

we reverse the remaining aspects of the chancellor's judgment as well. This case is remanded for a full trial on the merits.

¶36.   **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR.   RANDOLPH, P.J., PIERCE AND COLEMAN, JJ., NOT PARTICIPATING.**