# IN THE SUPREME COURT OF MISSISSIPPI

## NO.  2016-CA-01057-SCT

*DAVID NEIL HARRIS, SR., VECIE MICHELE HARRIS, AND CLYDE H. GUNN, III*

*v.*

*STATE OF MISSISSIPPI, SECRETARY OF STATE, JACKSON COUNTY, MISSISSIPPI, CITY OF OCEAN SPRINGS, MISSISSIPPI AND DELBERT HOSEMANN, JR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2016 |
| TRIAL JUDGE: | HON. HOLLIS McGEHEE |
| TRIAL COURT ATTORNEYS: | JOHN G. CORLEW |
| | VIRGINIA T. MUNFORD |
| | DAVID N. HARRIS, JR. |
| | W. TREY JONES |
| | JOSEPH A. SCLAFANI |
| | HUGH D. KEATING |
| | JE'NELL B. BLUM |
| | ROBERT W. WILKINSON |
| | AMY LASSITTER ST. PE' |
| | DAVID CRANE |
| | LEE D. THAMES, JR. |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID N. HARRIS, JR. |
| | A. SCOTT CUMBEST |
| | JOHN G. CORLEW |
| ATTORNEYS FOR APPELLEES: | JOSEPH ANTHONY SCLAFANI |
| | W. TREY JONES |
| | HUGH D. KEATING |
| | JE'NELL B. BLUM |
| | LEE D. THAMES, JR. |
| | DAVID CRANE |
| | ROBERT W. WILKINSON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 11/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

*CLYDE H. GUNN, III*

*v.*

*THE STATE OF MISSISSIPPI, C. DELBERT HOSEMANN, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE AND AS TRUSTEE OF THE PUBLIC TIDELANDS TRUST, JACKSON COUNTY, MISSISSIPPI AND CITY OF OCEAN SPRINGS, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2016 |
| TRIAL JUDGE: | HON. HOLLIS McGEHEE |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID N. HARRIS, JR. |
| | A. SCOTT CUMBEST |
| | JOHN G. CORLEW |
| ATTORNEYS FOR APPELLEES: | JOSEPH ANTHONY SCLAFANI |
| | W. TREY JONES |
| | HUGH D. KEATING |
| | JE'NELL B. BLUM |
| | LEE D. THAMES, JR. |
| | DAVID CRANE |
| | ROBERT W. WILKINSON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 11/08/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Landowners David Neil Harris, Sr., Vecie Michelle Harris ("Harris")[1] and Clyde H.

Gunn III filed suits to confirm title to their waterfront properties in Ocean Springs,

---

[1] After entry of final judgment in this matter, the Harrises sold their property and assigned their rights in this cause of action. For consistency with the record, we will continue to refer to the Harrises as the landowners.

Mississippi.  The State of Mississippi (the "State"), the County of Jackson (the "County") and the City of Ocean Springs (the "City") asserted title to a portion of the same waterfront properties claimed by the landowners: a strip of sand beach located south of a road and a seawall.  After a full trial on the merits, the chancellor found that the State of Mississippi held title to the sand beach in front of the Harris and Gunn properties as public-trust tidelands.  The landowners now appeal.  After review, we find no error and affirm the chancellor's final judgments.

## FACTS AND PROCEDURAL HISTORY

¶2.     Harris and Gunn both own beachfront property along "East Beach" in Ocean Springs, Mississippi.  *Hosemann v. Harris*, 163 So. 3d 263, 265 (Miss. 2015).  "Starting from the Mississippi Sound going north, there is marsh grass, a sand beach, a seawall, a road, and the yards of the Gunn and Harris properties."  *Id.*

¶3.     Harris and Gunn previously filed for an injunction in Hinds County Chancery Court to prevent the City from constructing a sidewalk on the beach.  *Sec'y of State v. Gunn*, 75 So. 3d 1015, 1016 (Miss. 2011).  As the parties represented that suits to confirm title had already been filed in the Jackson County Chancery Court, the Hinds County Chancery Court refrained from confirming title but did issue a permanent injunction preventing the City from constructing the sidewalk.  *Id.* at 1016–17, 1019.  On appeal, this Court vacated the permanent injunction and left the initial preliminary injunction in place until ownership of the beach could be determined.  *Id.* at 1017.

¶4.     Harris and Gunn then each proceeded to confirm title in the Jackson County actions.

3

*Harris*, 163 So. 3d at 266. Their suits were consolidated first for discovery and later for all purposes. *Id.*

¶5. Eventually, the chancellor granted Harris and Gunn partial summary judgment, finding that under the Public Trust Tidelands Act (the "Tidelands Act") the boundary of the tidelands was the mean high-water line closest in time to July 1, 1973.[2] *Id.* The chancellor ruled "that the State had failed in its burden to produce admissible evidence showing the boundary was not this line." *Id.*

¶6. A trial was held on the County's and City's remaining adverse possession and prescriptive easement claims. *Id.* "The chancellor confirmed and quieted title to the sand beach in Gunn and Harris, subject to prescriptive easements for the County and City. The court held the State, County, and City failed to prove adverse possession or public prescriptive easement by clear and convincing evidence." *Id.* at 266–67. The chancellor did find that the County had an easement to maintain the sand beach for seawall protection and that the City had an easement for road maintenance. *Id.* at 267.

¶7. The State, County and City appealed the decision. *Id.* On appeal, this Court reversed the chancellor's grant of partial summary judgment to Harris and Gunn, reversed the remaining aspects of the chancellor's judgment and remanded the case for a full trial on the merits. *Id.* at 274.

¶8. On remand, a five-day trial was held. On June 3, 2016, the chancellor issued an

---

[2] Subject to the common law, the Tidelands Act requires the boundary map of tidelands in developed areas to use the determinable mean high-water line nearest the effective date of the Coastal Wetlands Protection Act—July 1, 1973. Miss. Code Ann. § 29-15-7(1)–(2) (Rev. 2010).

4

opinion letter to counsel, detailing his findings of fact and conclusions of law. The chancellor also entered final judgments in both cases. The final judgments confirmed title to Harris and Gunn to their properties up to the southern edge or toe of the seawall, except for easements awarded to the County where the seawall was located and to the City where the roadway was located. The judgments also confirmed that the sand beach located south of the seawall was public-trust tidelands owned by the State. As to the injunction granted by the Hinds County Chancery Court, the judgments directed the parties to provide the Hinds County Chancery Court copies of the judgments to resolve the injunction. Last, the final judgments recognized that the County and City had met their burdens of proof on their claims of ownership to the sand beach through prescriptive easements and adverse possession. The judgments noted, though, that the County's and City's claims did not and could not defeat title held by the State.

¶9.     Aggrieved, Harris[3] and Gunn now appeal. Gunn raises two issues:

[I.]     Whether the uncontradicted evidence demonstrates that the mean high waterline along the South Boundary of the Clyde H. Gunn, III property is located waterward of the seawall, waterward of the sand beach, waterward of the marsh grass and waterward of the water's edge and pursuant to the Public Trust Tideland Act of 1989, that line is the line of demarcation between public trust tidelands and private property and Mr. Gunn is entitled to confirmation of his title to the water's edge as described in the continuous chain of title to his property commencing with the conveyance of that property to Louis Arlan Caillavet by the United States of America by patent dated February 2, 1837.

[II.]    Whether there is clear and convincing evidence to support claims of adverse possession and prescriptive easement made by Jackson County, Mississippi and the City of Ocean Springs to the beach front property

_____

[3] Harris filed a motion to reconsider that the chancellor denied.

5

of Plaintiffs/Appellants.

We address the tidelands issue first; it is dispositive of Gunn's appeal.[4] Harris raises five errors all of which concern the chancellor's factual findings. For clarity, we combine a number of these alleged errors and address them second.

## STANDARD OF REVIEW

¶10. "This Court will not reverse the chancellor's findings of fact 'unless they are manifestly wrong, not supported by substantial credible evidence, or an erroneous legal standard was applied.'" *Bayview Land, Ltd. v. State ex rel. Clark*, 950 So. 2d 966, 971–72 (Miss. 2006) (quoting *Columbia Land Dev., LLC v. Sec'y of State*, 868 So. 2d 1006, 1011 (Miss. 2004)). "On the other hand, when we review questions of law, a de novo standard of review is applied." *Id.* at 972 (citing *Tucker v. Prisock*, 791 So. 2d 190, 192 (Miss. 2001)).

## ANALYSIS

### I. Tidelands Common Law and the Tidelands Act

¶11. The parties disagree on what law controls. Harris and Gunn argue that the boundary line drawn by the Secretary of State, pursuant to the Public Trust Tidelands Act, governs. It is undisputed that the Secretary of State drew this line seaward of East Beach in the waters of the Mississippi Sound. Harris and Gunn support their argument by citing their deeds, which describe their property as reaching "to the water's edge." The State, County and City respond that the line drawn by the Secretary of State is not determinative of the boundary of

---

[4] We refrain from addressing whether or not the County and City met their burden of proof on their adverse-possession and prescriptive-easement claims. As discussed in detail, the disputed beach is public-trust tidelands held in trust by the State. Neither the County nor the City argue that it can defeat title held by the State.

the tidelands. Instead, they argue that the line functions as a starting point to determine the boundary of the tidelands and does not control because they claim that the County constructed East Beach. Thus, the State, County and City argue that the artificial beach is tidelands, held in trust by the State. In order to resolve the controlling law, we begin our analysis with a brief summary of the body of law as it is relevant to this appeal.[5]

### A. A Brief Summary of Tidelands Law

¶12. "When admitted into the Union, the State of Mississippi was granted title to lands subject to the ebb and flow of the tide and up to the mean high water level, without regard to navigability." *Harris*, 163 So. 3d at 268. The Mississippi Constitution provides that "[l]ands belonging to, or under the control of the State, shall never be donated directly or indirectly, to private corporations or individuals. . . ." Miss. Const. art. 4, § 95.

¶13. Despite article 4, section 95, this Court, in *Harrison County v. Guice*, held that the upland landowner acquires fee simple title to additional lands created by filling tidelands where the landowner had no part in creating the additional land. *Harrison Cty. v. Guice*, 140 So. 2d 838, 841–42 (Miss. 1962), *overruled by* *Miss. State Highway Comm'n v. Gilich*, 609 So. 2d 367 (Miss. 1992). The United States Court of Appeals for the Fifth Circuit declined to follow *Guice*, recognizing article 4, section 95: "The common law doctrine of artificial accretion must yield to the command of the Mississippi Constitution as to the disposition of state owned lands." *United States v. Harrison Cty., Miss.*, 399 F.2d 485, 491 (5th Cir. 1968) (citing Miss. Const. art. 4, § 95).

---

[5] This Court has surveyed this body of law in depth multiple times. *See* *Sec'y of State v. Wiesenberg*, 633 So. 2d 983, 988–89 (Miss. 1994); *Bayview*, 950 So. 2d at 972–77.

¶14. In 1989, the Legislature passed the Public Trust Tidelands Act "to resolve the uncertainty and disputes . . . as to the location of the boundary between the state's public trust tidelands and the upland property." Miss. Code Ann. § 29-15-3(2) (Rev. 2010). Also, the Legislature confirmed "the mean high water boundary line as determined by the Mississippi Supreme Court, the laws of this state and this chapter." *Id.* It further recognized that tidelands are held in trust for the public and that upland landowners have litoral and riparian common-law rights. Miss. Code Ann. § 29-15-5(1) (Rev. 2010).

¶15. The Tidelands Act required the Secretary of State to map the boundary of the public-trust tidelands. Miss. Code Ann. § 29-15-7(1) (Rev. 2010). In developed areas, the mapped boundary was to be "the determinable mean high water line nearest the effective date of the Coastal Wetlands Protection Act"—July 1, 1973. *Id.* Providing guidance for the mapping process, the Legislature, though, recognized the ambulatory nature of the boundary of tidelands, reaffirmed the doctrines of accretion and reliction and declared that "the common law doctrine as it pertains to such tidelands, submerged lands and riparian and littoral rights . . . [is] the law of this state." Miss. Code Ann. § 29-15-7(2) (Rev. 2010).

¶16. Throughout the Tidelands Act, the Legislature provided a number of grievance processes for upland landowners. Miss. Code Ann. § 29-15-7(4)–(6) (Rev. 2010). The Tidelands Act required the Secretary of State to allow public comment on the preliminary map for sixty days. Miss. Code Ann. § 29-15-7(4). Also, the Secretary of State had to notice any landowners who were determined to be in violation of the final map, informing them that they had three years to submit a contrary claim. *Id.* Further, if the dispute could not be settled

8

between the Secretary of State and the landowner, either party could petition the chancery court to resolve the disagreement. Miss. Code Ann. § 29-15-7(5). Last, these grievance processes were in addition to the right to quiet title, subject to a three-year statute of limitations. Miss. Code Ann. § 29-15-7(6).

¶17. Without mention of the Tidelands Act (and before the Secretary of State finalized the boundary map), this Court decided *Mississippi State Highway Commission v. Gilich* in 1992. *Gilich*, 609 So. 2d at 372–375. The *Gilich* Court overruled *Guice* and held that unless the landowners could prove that a natural beach existed prior to the creation of an artificial beach in the tidelands, the artificial beach was still tidelands held in trust by the State. *Id.* at 374. The Court recognized that, "[o]nce held by the state in trust, properties are committed to the public purpose and may be alienated from the state only upon the authority of legislative enactment and then only consistent with the public purposes of the trust." *Id.*

¶18. Two years after *Gilich* (and still before the finalized boundary map), this Court held that the Tidelands Act was constitutional pursuant to a challenge from the Secretary of State. *Wiesenberg*, 633 So. 2d at 989–94. This Court determined that the Tidelands Act did not result in an unconstitutional donation of trust land and that any incidental loss of trust land to an upward landowner was for the higher public purpose of determining the boundary of the tidelands. *Id.* at 991–992. In reaching this conclusion, the *Wiesenberg* Court noted the amount of discretion the Tidelands Act vested in the Secretary of State to consider "the common law of this State pertaining to tidelands, submerged lands, and riparian and littoral rights." *Id.*; *see also Stewart v. Hoover*, 815 So. 2d 1157, 1161–62 (Miss. 2002)

(recognizing the common law's application to the Tidelands Act); *Bayview*, 950 So. 2d at 981, 988 (same).

### B.    *Hosemann v. Harris*

¶19.    With this law in mind, this Court remanded the dispute to the chancery court for a full trial on the merits.  *Harris*, 163 So. 3d at 274.  The chancery court had granted partial summary judgment to Harris and Gunn, finding that the State had failed in its burden to produce admissible evidence that the boundary of the tidelands was not the mean high-water line closest in time to July 1, 1973.  *Id.* at 266.  After the partial grant of summary judgment, the case was tried and the chancery court held that the State, City and County had failed to prove their claim of title to the beach either by adverse possession or by prescriptive easement.  *Id.* at 266–67.  The chancery court quieted title in Harris and Gunn subject to the County's prescriptive easement for seawall maintenance and protection and the City's easement for road maintenance.  *Id.*

¶20.    In remanding, the Court noted that "the use of the 1973 starting point is subject to state common law regarding tidelands, submerged lands, and riparian and littoral lands." *Id.* at 273.  The *Harris* Court reasoned,

> It is undisputed that the mean high water mark closest to July 1, 1973, is seaward of the sand beach.  However, this Court's holding in *Gilich* . . . show[s] that the 1973 water line is not controlling with regard to sand beaches created by filling in tidelands.  The State created genuine factual issues by producing evidence supporting the conclusion that East Beach was constructed by filling in tidelands.

*Id.*  In essence, the Court applied common-law principles to the Tidelands Act and recognized that the property owners would not hold title to East Beach if the beach was

10

artificial. ***Id.*** The ***Harris*** Court reversed the partial grant of summary judgment and "the remaining aspects of the chancellor's judgment as well." ***Id.*** at 274.

### C. The Application of Tidelands Law to the Dispute

¶21. The Secretary of State's final boundary map reflects the intent of the Legislature by applying common-law principles to the boundary of the tidelands. It is determinative of the boundary of the tidelands. In December 1994, the Secretary of State finalized the Ocean Springs Quadrangle of the map. The map includes a solid line drawn along the coast, seaward of East Beach.

¶22. To be clear, the 1994 map is the culmination and expression of the Legislature's intent to determine the boundary of public-trust tidelands through the Tidelands Act. While the Tidelands Act required the July 1, 1973, determinable high-water line to be used as a starting point to determine the tidelands boundary, the 1994 map finalized the boundary of the tidelands. In other words, the 1994 map is the finalized expression of the boundary of the tidelands. The Secretary of State is bound to the map that he has drawn. Under the common law, the 1994 map is only the starting point now in the sense that the Court must determine what if any effect accretion and reliction has had on the boundary of tidelands subsequent to the 1994 map's finalization.

¶23. Here, though, the 1994 map's legend reflects ***Gilich***'s holding that artificially created tidelands do not accrete to the upward landowner. The legend provides that the solid line "[d]enotes approximate location of mean high water in areas where the current location of said line (or the toe of the seawall in areas where beach renourishments has occurred) is the

11

boundary of public trust lands." As this Court recognized in *Wiesenberg*, an "integral cog" of the Tidelands Act was "the amount of discretion which the Secretary of State was granted in finalizing the map." The map's legend is the result of this discretion—the Secretary of State's application of the common law to the boundary line of the tidelands. This Court has repeatedly held that the July 1, 1973 "starting point is subject to state common law regarding tidelands, submerged lands, and riparian and littoral lands." *Harris*, 163 So. 3d at 273 (citing *Wiesenberg*, 633 So. 2d at 986; *Stewart*, 815 So. 2d at 1162). Likewise, the 1994 map is now the starting point subject to state common law regarding tidelands, submerged lands and riparian and littoral lands.

¶24. The chancellor understood the controlling tidelands law and limited his opinion to whether or not East Beach was a natural beach or a man-made beach. The chancellor wrote, "the first line of inquiry must be to ascertain whether the disputed strip of sand is natural or man made. The resolution of the natural versus man-made question will substantially control the outcome of this matter." We agree. The dispositive issue is whether or not East Beach was a natural beach or whether it was an artificial beach created along a shoreline without any prior natural beach. Given the legend on the 1994 map, East Beach is public-trust tidelands because the chancellor found that East Beach was artificial and that there had not been any natural beach along the prior shoreline.

## II. Findings of Fact

¶25. At trial, the dispositive issue was whether or not East Beach was originally a natural beach or man-made beach. The chancellor determined that the beach was man-made. On

12

appeal (after the resolution of Issue I), the question becomes whether the chancellor's judgment is manifestly wrong or unsupported by credible evidence. Harris raises several alleged errors on the part of the chancellor.

### A. Confirmation of Title

¶26. Harris first argues that the chancellor manifestly erred by failing to confirm title. He contends that the chancellor failed to make "any specific findings regarding the location of the southern boundary of the Harris and Gunn property."

¶27. This argument—which the chancellor addressed in his denial of reconsideration—ignores the plain language of the chancellor's final orders. The chancellor's description confirmed the southern boundary of the Harris property:

> . . . thence run South along the property formerly of Striegel a distance of 925 feet, more or less, to a concrete monument which monument is 120 feet West of the point of beginning, thence continue South 87 feet, more or less to the toe/south face of the current seawall, thence run East 120 feet along the toe/south face of the current seawall . . . .

The description also described an easement in favor of the County "where the current seawall is now located" and an easement in favor the City "where the current East Beach roadway is now located." Likewise, the chancellor described Gunn's southern boundary:

> . . . run thence South along the West line of the property of Striegel and along a line parallel to and 222 feet East of the East line of said Ashley Place Subdivision a distance of 1,015 feet, more or less, to a point on the North face of the seawall, continue thence South to the tow of the seawall, run thence West along the toe of the seawall 222 feet, more or less, to a point South of the Point of Beginning. . . . Said property being bounded . . . South by the toe of the seawall.

The Gunn description also awarded prescriptive easements in favor of the County "where the

13

seawall is located" and a prescriptive easement to the City "where the East Beach roadway is located." Harris's argument that the chancellor erred by not confirming title is without merit.

### B. Witness Testimony

¶28. Next, Harris raises a number of issues that he maintains are manifest error in the chancellor's assessment of witness testimony. "This Court will not reverse a Chancery Court's findings of fact where they are supported by substantial credible evidence in the record." *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987). "Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of 'the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.'" *Sproles v. Sproles*, 782 So. 2d 742, 747 (Miss. 2001) (quoting *McKee v. Flynt*, 630 So. 2d 44, 47 (Miss. 1993)).

¶29. After review of the chancellor's judgments, opinion and the record, we find no error—and certainly no manifest error. Ample evidence in the record supports each of the chancellor's final judgments in this matter. Many of Harris's alleged errors on appeal are simply disagreements with the factual determinations made by the chancellor.

### 1. Eyewitnesses

¶30. Harris contends that the chancellor manifestly erred concerning two eyewitnesses: Joan Salvant and Larry Corban. Harris maintains that the chancellor erred in relying on Salvant's testimony, since she admitted that she was not familiar with the location of the boundary lines of the Harris and Gunn properties. Regarding Corban, Harris argues that the

14

chancellor manifestly erred in finding that Harris and Gunn had not produced any eyewitnesses of the East Beach area during the relevant time frame. Harris contends that Corban provided eyewitness testimony about the East Beach area.

*Joan Salvant* [6]

¶31. Salvant's recorded deposition testimony was entered at trial by the State. Salvant testified that she spent every summer in the 1930s, the 1940s and into the 1950s at her family's property on the shoreline that is now referred to as East Beach. Salvant explained that Week's Bayou was at the western end of the shoreline; her family's property was further east; and the Marine Research Lab area was the furthest east at the end of the shoreline. Further, Salvant testified with familiarity to the whole coastline and had personally observed both low and high tides along the coast.

¶32. Relevant to the Harris and Gunn properties, Salvant testified that prior to the late 1940s no dry sand—from Week's Bayou east to the Marine Research Lab—would have been left uncovered at high tide. On the east end of the shoreline, Salvant recalled that the water nearly came up to the road with just enough room for her father to pull two wheels of their family car off the road to park. Also, Salvant maintained that the current sand at the beach along the shoreline was pumped up from the sound after World War II. She maintained that this happened two different times during two different years. In 2004 for her fiftieth

---

[6] As an unrelated aside, Joan Usner Salvant is a nationally recognized artist. Her paintings and drawings are found in the art collections of two United States Presidents (George H. W. Bush and Jimmy Carter), various United States Congressmen, a number of state governors and various first ladies. Her artwork is on display in the National Museum of Women in the Arts in Washington D.C. and at the University of Texas Visitors Center.

wedding anniversary, Salvant again visited East Beach. She observed East Beach from Week's Bayou to the Marine Research Lab. Salvant testified that the current East Beach was not there prior to the end of World War II.

¶33.   Harris now argues that the chancellor erred in relying on Salvant's testimony because Salvant had admitted she did not know the locations of the Harris and Gunn properties. Also, Harris highlights the fact that Salvant did not know whether the sand that was pumped up from the sound was pumped up in front of the Harris or Gunn properties.

¶34.   The chancellor, however, did not abuse his discretion by relying on Salvant's testimony. Salvant testified that no dry sand was present at high tide the length of the shoreline from Week's Bayou (undisputedly west of the Harris and Gunn properties) to the point of the shoreline where the Marine Research Lab was built (undisputedly east of the Harris and Gunn properties). She also testified that sand was pumped from the sound along this same section of shoreline.[7]

¶35.   Further, substantial evidence corroborated Salvant's testimony. Jane Beaugez, an Ocean Springs resident since the late 1940s, testified to the changes in the shoreline throughout the years. Beaugez was familiar with the location of the Harris and Gunn properties and testified that from her earliest memory no uncovered sand was visible at high

---

[7] As the chancellor noted in denying reconsideration,

> It is axiomatic to say the 'Plaintiffs' property' was not known to Mrs. Salvant, the Plaintiffs had no property and were likely not yet even born when Mrs. Salvant was making her observations of the area in question. Mrs. Salvant's observations, which she gave in detail, covered the entire area presently encompassed by the Gunn and Harris' properties.

tide in front of either property. She further testified that the high tide came up to the seawall before the beach was built and that government workers built the beach by pumping in and trucking in sand.

¶36. Expert testimony also corroborated Salvant's account of the shoreline. The State's expert, Dr. Claus Meyer-Arendt (discussed below) concluded that East Beach along the shoreline was artificial. He also concluded that the current seawall was placed seaward of the former mean high-tide line—in the tidelands.

¶37. Much of the material that Meyer-Arendt relied on to form his conclusions was entered into evidence and corroborates Salvant's testimony. This evidence included newspaper articles and various documents concerning the construction of East Beach and its seawall.

¶38. Also, a composite of newspaper clippings referencing the construction of the seawall and East Beach lent credence to Salvant's testimony. One article, dated August 4, 1949, states, "Plans call for a sea wall similar to the sea wall at West Beach. The county dredge will place sand up against the wall forming a nice bathing beach beyond the wall." Another article, dated May 26, 1951, states, "The Ocean Springs seawall will be extended approximately one-half mile from its present terminus to Halstead road, a sand beach pumped in along the length of the wall and a new 40-foot roadway constructed behind it."

¶39. Correspondence between the Jackson County Board of Supervisors and the United States Army Corp of Engineers also supports portions of Salvant's account. According to Meyer-Arendt, the Jackson County Board of Supervisors, in their request for permission to build a beach, attached a map depicting that "the beach would be built to a width of 200 feet

along the entire length of the East Beach." The response letter from the United States Army Corp of Engineers, dated January 25, 1954, states, "you are hereby authorized by the Secretary of the Army to construct a sand beach 200 to 300 feet wide by 11,700 feet long, in [the] Mississippi Sound, fronting Ocean Springs, Mississippi."

¶40. Also supporting portions of Salvant's testimony, a number of the minutes from various meetings of the Jackson County Board of Supervisors concerning the construction of the seawall were admitted in evidence. The proposal for the seawall was presented at a July 19, 1949, meeting, and the specifications for the wall were explained to potential bidders in 1950.

¶41. In light of the evidence, the chancellor did not manifestly err in relying on Salvant's recollection. Despite the fact that Salvant was not familiar with the boundary line of the Harris and Gunn properties or the specific locations of the properties, she clearly testified about the entire length of the shoreline from Week's Bayou to the Marine Research Lab. Further, other evidence corroborates her account.

*Larry Corban*

¶42. Corban's testimony from a previous proceeding was introduced; he testified that he first saw the East Beach area in 1946 or 1947. Corban testified that as far as he could recall no substantial change in the waterfront on East Beach had occurred in his lifetime. Also, Corban testified that "It's my understanding that Jackson County built a seawall and road while I was in college, would have been in about 1950." Last, Corban testified that no substantial change had occurred to the properties from his first recollection in 1947 to the

18

depiction of the properties in a 1992 aerial photograph.

¶43.    Harris argues that the chancellor erred in finding that Harris and Gunn did not offer eyewitness testimony about the East Beach area.  The actual issue here is that Harris does not agree with the chancellor's assessment of the weight and credibility of Corban's testimony. It is well settled law that "the chancellor, as the trier of fact, is the judge of 'the credibility of the witnesses and the weight of their testimony . . . .'" *Sproles*, 782 So. 2d at 747 (quoting *McKee*, 630 So. 2d at 47).  Two out of three of Corban's answers on direct examination were not definite: "Not that I recall" and "It's my understanding . . . while I was in college. . . ." Corban admitted that he was in college during the critical time period in the early 1950s.

¶44.    Also, it is clear that the chancellor did consider Corban's testimony.  In the final opinion letter sent to counsel, the chancellor mentioned that he considered *all* of the contrary evidence in coming to his conclusions: "There is contrary evidence, as noted above and as otherwise reflected in the record, all of which the court has considered.  However, when the evidence supporting the claim of a natural beach is weighed against that supporting a man made beach the former position is, at best, weak."  We find no error.

### 2.    Expert Testimony

¶45.    Harris claims two specific errors concerning the expert testimony admitted at trial. First, Harris argues that the chancellor blatantly disregarded the testimony of Donald Rowe who testified about his survey of the current mean high-water line.  Second, Harris argues that consideration of the full expert report of Meyer-Arendt demonstrates that the mean high-water line has always been in the same location (and, therefore, East Beach is a natural

19

beach). Neither argument has merit.

*Donald Rowe*

¶46.   At trial, Rowe testified to his survey of the current mean high-water line on February 22, 2012, for the Harris and Gunn properties. On that day, the mean high-water line for the Harris property ranged from 114 feet to 117 feet from the seawall. For the Gunn property, the range was from 137 feet to 145 feet from the seawall to the mean high-water line.

¶47.   Rowe's testimony, though, was not relevant to the dispositive legal issue at trial of whether or not the beach was natural or man-made. The fact that the mean high-water line was seaward of the current East Beach was an uncontested issue at trial. The contested issue at trial was whether or not East Beach was natural (and not tidelands) or man-made (and, therefore, tidelands). Thus, the chancellor did not manifestly err here.

*Dr. Claus Meyer-Arendt*

¶48.   Next, Harris argues that the chancellor erred by not considering Meyer-Arendt's testimony that his 1992 report concluded that a sand beach had existed along the shoreline in 1950. According to Harris, this fact, combined with Rowe's survey, demonstrates that East Beach was a natural beach.

¶49.   Nothing in Meyer-Arendt's report, though, conflicts with the chancellor's conclusion that East Beach was man-made. Indeed, the 1992 report supports the position: "Apparently some sand was placed on East Beach prior to the onset of seawall construction in 1949 . . . , the modern beach was not completed until a second phase of nourishment in 1954 . . . ." The report also states, "The 1950 coastal chart . . . reflected the initial disposal of dredge

spoil at both Front and East Beaches, where the shoreline had been displaced about 200 ft (60 m) seaward along most of Front Beach and about half of that along East Beach (see figure 2)." Also, as already mentioned, Salvant testified that sand was pumped in to create East Beach in two separate years. The chancellor did not manifestly err in his consideration of the expert report.

### C. Invasion of Property Rights

¶50. Last, Harris argues that the chancellor manifestly erred by failing to acknowledge that any action by Jackson County in creating East Beach was an invasion of private property rights, constituting a taking without just compensation under the Fifth and Fourteenth Amendments. To support his argument, Harris again cites the testimony of Rowe and Meyer-Arendt, arguing that their testimony (discussed above) supports the claim that Jackson County pumped sand onto the Harris and Gunn properties.

¶51. Harris's argument requires this Court to accept his interpretation of the evidence rather than the chancellor's findings. Harris maintains that Jackson County violated his property rights by pumping in sand on the East Beach shoreline because the 1954 letter from the United States Army Corp of Engineers conveyed no property rights to the Jackson County Board of Supervisors. Harris ignores, though, the earlier statement in the letter that the Board of Supervisors was authorized to create a sand beach "in [the] Mississippi Sound." In denying reconsideration, the chancellor stated, "Thus, because the evidence establishes that [the] beach was constructed in State-owned tidelands, the construction of the beach did not invade the property rights of the Plaintiffs." After review, we find no error here.

21

## CONCLUSION

¶52.   The chancellor correctly determined that the question of whether or not East Beach was natural or artificial controlled the legal dispute as to the boundary of the tidelands.  With this legal framework established, the chancellor determined that no natural beach existed on the shoreline prior to the construction of East Beach.  Ample evidence in the record supports this determination.  Therefore, we affirm the chancellor's final judgments.

¶53.   **AFFIRMED.**

**WALLER, C.J., KITCHENS, P.J., KING, COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR.  RANDOLPH, P.J., NOT PARTICIPATING.**